STEPHEN L. PEVAR
American Civil Liberties Union Foundation
2074 Park Street
Hartford, Connecticut 06106
(860) 570-9830

LEA C. COOPER   ISB # 3505
American Civil Liberties Union of Idaho Foundation
P.O. Box 1897
Boise, Idaho 83701
(208) 344-9750 ext. 206

JAMES D. HUEGLI   ISB # 8172
Cooperating Attorney, ACLU of Idaho Foundation
1770 W. State St., Suite 267
Boise, ID 83702
(208) 631-2947

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MARLIN RIGGS, individually, and JOSE PIÑA, JOE ROCHA, ANDREW IBARRA, JOSHUA KELLY, and RAY BARRIOS, individually and on behalf of a class of all other persons similarly situated, | ) ) ) ) ) | Case No. 1:09-cv-00010-BLW |
| | ) | PLAINTIFFS' AMENDED |
| Plaintiffs, | ) ) | COMPLAINT FOR DAMAGES, |
| vs. | ) ) | AND FOR CLASSWIDE |
| PHILIP VALDEZ, NORMA RODRIGUEZ, CHRISTOPHER ROSE, TODD DANFORTH, and OFFICER DEAN, individually and in their official capacities; BRENT REINKE, MARK FUNAIOLE, JANIE DRESSEN, NORMAN LANGERAK, MIKE MATTHEWS, and BILL YOUNG, in their official capacities; and CORRECTIONS CORPORATION OF AMERICA, Inc. | ) ) ) ) ) ) ) ) ) ) ) ) | DECLARATORY AND INJUNCTIVE RELIEF |
| Defendants. | ) | |

## INTRODUCTION

ICC is an extraordinarily violent prison.  It is known in Idaho as "Gladiator School" for a reason.  More violence occurs at ICC than at Idaho's eight other prisons combined, and the unnecessary carnage and suffering that has resulted is shameful and inexcusable.  ICC not only condones prisoner violence, the entrenched culture of ICC promotes, facilitates, and encourages it.  Indeed, ICC staff cruelly use prisoner violence as a management tool.

Violence is epidemic at ICC for a host of reasons, including the fact that the Defendants turn a blind-eye to it; they fail to adequately investigate assaults and therefore are unable to fashion effective remedial measures to prevent assaults from recurring; they refuse to discipline the guards whose malfeasance precipitated prisoner violence; they frequently place vulnerable prisoners with predators; they fail to protect prisoners who request and need protection from assault; and ICC is understaffed, inadequately supervised, and guards are inadequately trained.

The Eighth Amendment to the Constitution prohibits the imposition of "cruel and unusual punishments."  This means, the Supreme Court has recognized, that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  In other words, people are sent to prison *as* punishment, not *for* punishment.  "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834 (internal citation omitted).  Government officials "are not free to let the state of nature take its course" in America's prisons. *Farmer*, at 833.   The administrators of ICC are ignoring this constitutional duty, resulting in wholesale fear, intimidation, and violence within the prisoner population.

ICC is owned by the State of Idaho, was built with tax funds, and is located on public land. However, ICC is operated (for a profit) by Corrections Corporation of America pursuant to a contract with the Idaho Department of Corrections (IDOC). Plaintiffs request, among other things, that IDOC be ordered by this Court to set strict deadlines by which ICC must develop adequate policies, and hire and train a sufficient number of guards, to reasonably safeguard prisoners from assault, and that if ICC continues to ignore its duties under the Eighth Amendment, the Court should order IDOC to remove all Idaho prisoners from this excessively violent and inhumane facility. In addition, compensatory and punitive damages are sought for Plaintiff Marlin Riggs, one of the scores of prisoners brutally assaulted as a result of Defendants' deliberate indifference to prisoner safety. Relief is sought pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

1. This action arises under the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4). Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), in that all plaintiffs reside, and plaintiffs' claims arose, within the District.

## PLAINTIFFS

2. Named Plaintiffs Marlin Riggs, Jose Piña, Joe Rocha, Andrew Ibarra, Joshua Kelly, and Ray Barrios are adult citizens of the United States and are prisoners incarcerated under the jurisdiction of the Idaho Department of Corrections. Mr. Riggs is incarcerated at the St. Anthony Work Center in St. Anthony, Idaho. The other five named plaintiffs are incarcerated at the Idaho Correctional Center (ICC) in Kuna, Idaho.

## THE PLAINTIFF CLASS

3.   The named plaintiffs incarcerated at ICC bring this action on their own behalf and as representatives of all other persons now incarcerated, or who in the future may become incarcerated, at ICC.  Class certification is sought pursuant to F.R.Civ.P. 23(a), (b)(2). Class certification is appropriate because the members of the class are so numerous that joinder of all persons is impracticable; there are questions of fact or law common to the class; the representative parties' claims are typical of the claims of the class; and the named plaintiffs will fairly and adequately represent the interests of the class.  In addition, the defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making appropriate final declaratory and injunctive relief to the class as a whole, and the questions of law or fact common to members of the class predominate over any questions affecting individual members.  The members of the ICC plaintiff class are not seeking damages but only declaratory and injunctive relief.

## DEFENDANTS

4.   Defendants Philip Valdez (Warden), Norma Rodriguez (Unit Manager), Christopher Rose (Sergeant), Todd Danforth (Correctional Officer), and Officer Dean (Correctional Officer, first name unknown to Plaintiffs) are residents of Idaho and employees of ICC in the positions noted.  Each defendant is sued in his/her official and individual capacities.

5.   Defendant Brent Reinke is a resident of Idaho.  At all times material to this action, Mr. Reinke has been the Director of the Idaho Department of Corrections (IDOC).  As such, he is the agency official ultimately responsible under state law for ensuring the health and safety of the IDOC prisoners assigned to ICC.  Mr. Reinke is sued in his official capacity

only, that is, damages are not being sought against him but only declaratory and injunctive relief.

6. Defendants Mark Funaiole, Janie Dressen, Norman Langerak, Mike Matthews, and Bill Young are members of the Idaho Commission of Pardons and Parole. Under Idaho law, the Commission has the power to grant parole to Idaho's incarcerated prisoners, including the plaintiffs in this action. *See* Idaho Code § 20-223. These defendants are sued in their official capacity only, that is, damages are not being sought against them but only declaratory and injunctive relief.

7. Defendant Corrections Corporation of America (CCA) is a for-profit business incorporated under the laws of Maryland. As part of its profitable enterprises, CCA operates ICC.

## STATEMENT OF FACTS

8. ICC was constructed on state-owned land in Kuna, Idaho, with public tax funds. ICC is operated under the jurisdiction of IDOC.

9. IDOC entered into a contract with CCA under which CCA is paid to manage and operate ICC on a day-to-day basis.

10. Until recently, ICC housed approximately the same number of prisoners as does the Idaho State Correctional Institution (ISCI), nearly 1,500 men. Yet, during 2008 and 2009, three times as many prisoner-on-prisoner assaults occurred at ICC as at ISCI. Recently, new housing units were opened at ICC, and ICC now houses approximately 2000 prisoners.

11. The number of assaults actually occurring at ICC is considerably higher than reported, perhaps three times as high. For one thing, ICC deliberately fails to document many

assaults.  For another, many victims of prisoner assault choose to conceal the incident out of fear of reprisal by prisoners for being a "snitch."  Indeed, in a newspaper article dated April 5, 2009, an IDOC official, discussing the level of violence at ICC, told a reporter for the Associated Press: "It is fair to estimate that for every one incident we know of, there may be two that we do not."

12.   There are at least eleven reasons why violence at ICC far exceeds the violence in other Idaho facilities.  They are: (a) deliberate indifference of many ICC employees, including the named defendants; (b) inadequate training of staff; (c) inadequate number of staff; (d) inadequate supervision of staff; (e) the promotion of a culture throughout the facility that relies on the degradation, humiliation, and subjugation of prisoners, thereby creating excessive and unnecessary tension, stress, and frustration within the prisoner population; (f) failure to adequately investigate acts of violence, including a failure to track the number and location of assaults so as to take appropriate remedial action; (g) failure to discipline those guards whose misconduct or malfeasance contributed to an act of violence, including those guards who deliberately arranged assaults or who refused to remove a prisoner from a clearly dangerous environment; (h) placement of vulnerable prisoners with predatory prisoners; (i) failure to isolate or properly discipline prisoners who attack other prisoners; (j) maintaining a "code of silence" such that staff are discouraged from reporting errors, including their own errors, that caused or contributed to an act of prisoner violence; and (k) the deliberate reliance on--and encouragement of-- prisoner violence as a management tool.

13. ICC is understaffed.  At times there are only two guards supervising more than 250 prisoners in the North Wing Units and only two for more than 350 prisoners in the West Wing Units.

14. Defendants may claim that the level of staffing at ICC is consistent with standards set by the American Correctional Association (ACA).  However, ACA standards recognize that where, as at ICC, training of staff is deficient, there is a high turnover rate, and violence is rampant in the prisoner population, then more staff is necessary.  Thus, ICC is understaffed.

15. Plaintiffs' attorneys have spoken with numerous former employees of ICC, including Michele Slay, Tedi Hernandez, Creig Smith, and Tammy McCall.  All of them agree that ICC is understaffed.  All of them also agree that as a result of deliberate indifference, prisoner-on-prisoner violence at ICC is much higher than it should be.

16. Training academies in Idaho instruct correctional officers and counselors to treat offenders with professionalism and courtesy and to seek to accommodate their legitimate needs.  In a report issued in January 2010 by the Office of Performance Evaluations of the Idaho Legislature, "Operational Efficiencies in Idaho's Prison System" (hereinafter, "Legislative Report"), it is expressly noted: "The Department of Correction's mission is to protect the public while maintaining a professional environment that results in a mutual respect between staff and inmates." (p. 21).

17. At ICC, in contrast, guards are encouraged to berate, humiliate, and degrade prisoners, and they frequently yell and swear at them.  Indeed, employees who relate to prisoners in a professional and courteous manner are ostracized by fellow employees and by supervisors and told that they have been "compromised."

18.   The net result of this oppressive, degrading, and dehumanizing behavior by staff is the creation of a hostile, frustrated, and angry set of prisoners who often resort to violence against other prisoners.   Many guards not only encourage prisoner violence but manipulate it to their own ends.

19.   For instance, a favorite tactic of ICC employees is to threaten a prisoner with placement in a housing unit where that prisoner is likely to be assaulted unless the prisoner consents to become an informant for the administration.

20.   This is a cruel tactic.   Prisoners who are found to be informants by other prisoners are routinely assaulted. *See Benefield v. McDowell*, 241 F.3d 1267 (10th Cir. 2001).   This tactic thus coerces prisoners into placing themselves at substantial risk of severe injury. They must choose between two options, both of which are inherently dangerous: become an informant, or be placed in a housing unit where they are likely to be assaulted.

21.   Ms. Slay will testify that on numerous occasions she observed prisoners, often in tears, begging Defendant Norma Rodriguez not to follow through with her threat to place them in a housing unit where Rodriguez knew they would be assaulted.   Prisoners would often fabricate stories that incriminated other prisoners just to satisfy Rodriguez's demands that they become informants.   Those prisoners who refused to comply with Rodriguez's requests, Ms. Slay observed, were often deliberately placed by Rodriguez in a housing unit in which they would likely be assaulted.

22.   Ms. Slay was present when Defendant Valdez employed that same tactic.   Valdez told a prisoner that unless he became in informant, the prisoner would be sent to a housing unit in which prisoners who committed his type of crime were usually assaulted.   Valdez told the prisoner: "You know you will get hurt there."

23.   Valdez and Rodriguez were aware at the time they participated in this tactic that prisoners who inform on other prisoners have a high risk of assault.

24.   Class plaintiff Brian Spaude is among the ICC prisoners threatened by Defendant Rodriguez with transfer to a housing unit in which Rodriguez knew he likely would be assaulted.   When Spaude failed to provide information that Rodriguez requested, she threatened to move him to the most violent housing unit in the prison, although ultimately she did not implement her threat.

25.   Class plaintiff Andrew Wolf is another ICC prisoner victimized by this tactic.   Wolf was placed in a housing unit in which other prisoners threatened to assault him.   Wolf reported these threats to Correctional Counselor J. Venim and asked to be transferred to a different housing unit.   Venim agreed to transfer Wolf but only if Wolf became an informant.   Venim asked Wolf to tell him which prisoner was keeping a tattoo gun in Wolf's current housing unit.   Wolf told Venim that he did not know who had a tattoo gun and did not want to become an informant anyway.   Venim then refused to transfer Wolf.

26.   Administrative officials, including Warden Valdez and Unit Manager Rodriguez, rely on violent prisoners to enforce their threats.   A symbiotic relationship exists between certain staff and notoriously violent prisoners.   This is evident by the fact that guards persistently send vulnerable prisoners to live near predatory prisoners, and when these predators commit assaults, they receive mild punishment, and often no punishment.   For instance, as discussed below, prisoner Todd Butters was told by a sergeant following Butters' assault that disciplinary charges would be filed against the assailants, but the sergeant subsequently apologized to Butters and said that "higher ups" had instructed him not to proceed with his plans to charge them.

27.   Some guards at ICC make no pretense of hating sex offenders, and their supervisors do nothing to stop them from acting on their hatred.  The prevailing culture at ICC permits them to express their hatred openly.   Ms. Slay will testify that one guard routinely berated sex offenders and told one such prisoner that he "should be shot."

**Defendants' Deliberate Indifference**

28.   Evidence of Defendants' deliberate indifference to prisoner health and safety is copious and overwhelming.  First, CCA refuses to provide funds for, and Warden Valdez refuses to hire and train, a sufficient number of correctional officers.  It is impossible for ICC to provide prisoners with adequate protection from assault--or to timely intervene when an assault has commenced--with as few guards as ICC has on its staff.

29.   Second, the training that ICC provides to persons seeking a position as a guard is inadequate and ineffective.  Former employees will testify at trial that during final examinations, answers to questions are sometimes written on the board, suggested or even given by the examiners, and that applicants rarely flunk the exam no matter how incompetent they may be.

30.   Third, CCA fails to require, and Defendants Valdez and Rodriguez refuse to ensure, that prisoner assaults will be adequately investigated in order to determine what steps should be taken to prevent future assaults, and to determine whether misconduct or malfeasance by a guard caused or contributed to the assault.

31.   Fourth, CCA and Defendant Valdez fail to ensure that those guards whose malfeasance or misconduct caused or contributed to prisoner violence will be disciplined or retrained.  Consequently, guards act with impunity even when they deliberately place prisoners in a housing unit where they are likely to be assaulted; when they refuse to remove prisoners

from housing units when these prisoners report having been threatened with assault; and when they negligently (or perhaps deliberately) open the wrong doors, thereby allowing prisoners to assault one another.

32.   Fifth, Warden Valdez has known for years that ICC prisoners face significant and unnecessary risk of injury from assault, and yet he refuses to take reasonable measures to abate that violence.   During at least the past four years, Valdez has read numerous prisoner grievances complaining about assaults; has seen medical reports describing serious injuries that prisoners have suffered from assaults; has spoken with many prisoners who have been assaulted; has read media reports issued in 2008 and 2009 identifying ICC as a grossly violent facility; and has spoken with staff who have complained about the level of violence at ICC.   Yet Valdez has permitted a reign of terror, violence, and intimidation to pervade ICC.

33.   Sixth, ICC maintains its own in-house medical unit, and it is obvious that ICC--under the direction and instruction of CCA and Warden Valdez--operates this unit in such a depraved manner that its intention is to *conceal* injuries, not treat them.   For instance, CCA and Valdez have established a policy and practice of not taking x-rays of the severe injuries suffered by assault victims.   This way, (a) ICC saves money (at the expense of prisoners who need urgent medical care) by not taking x-rays and not hiring medical staff to read the x-rays, and (b) ICC is able to conceal the extent of injuries suffered by the victims of assault.

34.   Seventh, ICC--under the direction and instruction of Warden Valdez--has a policy and practice of refusing to refer for prosecution the perpetrators of prisoner assaults, except in very rare situations.   This policy and practice is motivated by a desire to conceal the

carnage that is occurring at ICC.  This policy and practice encourages violent prisoners to assault other prisoners because they know they can do so with relative impunity.

35.   Eighth, Warden Valdez perpetuates a "code of silence" at ICC.  He discourages the reporting of official misconduct.  Valdez has given staff no training or any encourage-ment to report misconduct committed by staff.  To the contrary, those officers who report mistakes committed by officers are retaliated against by Valdez and by other staff.

36.   Ninth, Warden Valdez either promulgated or knows about and has acquiesced in the policy and practice of issuing Disciplinary Offense Reports to the *victims* of assaults.  This practice helps conceal the fact that guards failed to protect the victim from the attack.  Victims are frequently charged with "fighting" or "mutual combat" even when they were blind-sided by their assailant and offered no resistance to an assault.

37.   Tenth, ICC, in order to maximize its profits, generally operates at *or above* its operating capacity.  As noted in the 2010 Legislative Report, ICC's population in November 2009 was 100.2 percent (2,021 prisoners) of its operating capacity of 2,016 prisoners.  This predicament, although profitable for ICC, is dangerous to prisoners.  Having a small number of empty beds makes it difficult to quickly move prisoners away from a dangerous environment.  As the Legislative Report notes: "When prisons operate at or near capacity, the ability to safely manage population growth or contingencies such as emergencies or serious incidents is reduced." (p. 8).

38.   In short, Valdez has enacted policies and practices that foster violence, fail to reduce violence, and follows a turn-a-blind-eye approach to assaults.  As a result of Valdez's failure to properly control and supervise his subordinates, to hire and train enough staff,

and to take reasonable steps to prevent violence, Valdez has condoned, acquiesced in, and promoted the carnage occurring at ICC.

39. The failures described above continue to this day, placing all prisoners of ICC at unnecessary and substantial risk of being assaulted by other prisoners.

**Deliberate Indifference and Due Process Violations in Parole Determinations**

40.   As just mentioned, it is a favorite ploy of ICC staff to issue to the *victim* of a prisoner assault a Disciplinary Offense Report (DOR), otherwise known as a "write-up."  This is done in an effort to draw scrutiny away from the guards whose malfeasance caused the assault to occur and deflect it to the victim.  Thus, guards accuse these victims of being responsible for their injuries when, in truth, the assault was the by-product of guard misconduct.

41.   As discussed below, the five members of the Idaho Commission on Pardons and Parole, defendants herein, frequently take these fabricated DORs into account in determining a prisoner's parole eligibility.  As a result, these defendants have denied parole to victims of assault based at least in part on DORs that should never have been issued in the first place.

42.   Despite being told on numerous occasions by many victims of assault that a DOR had been issued unjustly, Defendant parole commissioners routinely fail to adequately investigate these claims.  On the contrary, these Defendants apply negative consequences to these DORs even when, as in the case of Plaintiff Riggs, the DOR was dismissed.

**Physical layout of ICC**

43.   ICC was opened in 2000 and designed to hold approximately 1250 prisoners.  However, in 2006-2007, bunks were added to many existing cells, thereby increasing the population

of the prison by nearly 200 prisoners (and decreasing the space many of them were provided in their cells and day rooms). In 2009, Pods D, E, and F were added to the existing structure, and a stand-alone building known as the PIE Building was also opened. Today, ICC holds approximately 2000 prisoners.

44.   North Wing of ICC contains three Units, each of which contains three Pods. The Pods are grouped A, B, C; J, K, L; and G, H, I. There is one Pod Control for each Unit.

45.   West Wing of ICC contains two Units of six Pods each: M, N, O, P, Q, R, and S, T, U, V, W, X.

**Interference with Plaintiffs' legal mail**

46.   During the course of investigating this case, attorneys for the Plaintiffs wrote more than fifty letters to prisoners. Most of these letters were delivered by prison staff unopened to the addressees, consistent with federal law and prison policy. But at least three letters were deliberately opened and the contents were read by staff (and the papers inside the envelopes were shuffled). These include two letters to Marlin Riggs at St. Anthony's and one letter to Steven Davis at ICC. The staff who delivered these letters did not admit that the letters had been opened in error, as they should have done. The opening of these letters outside the presence of the addressees constituted a violation of federal law and prison policy. Plaintiffs intend to seek a protective order from the Court if these violations continue.

**The loss and destruction of prisoner Concern Forms**

47.   Most of the prisoners whose assaults are summarized below submitted written Concern Forms to guards prior to their assaults, pleading for help. The vast majority of these forms were never answered.

48.  It is a common practice of ICC staff to disregard--and often discard--Concern Forms. Several former employees of ICC will testify at trial that they frequently saw Concern Forms in the trash that had been discarded by staff.

## PREVENTABLE ASSAULTS AT ICC

Listed below are summaries of twenty-three assaults that occurred at ICC since November 2006, each one of which was *entirely* preventable and was the result of deliberate indifference by ICC staff.  These assaults are presented in alphabetical order.

49.  The Supreme Court and the Ninth Circuit have made it clear that prison officials violate the Eighth Amendment rights of prisoners both when they *undertake an act* that places a prisoner at substantial risk of serious harm and when they *fail to act* to abate such a risk. "Thus, violations of the Eighth Amendment may occur as a result of either 'a prison official's act *or omission*.' *Farmer [v. Brennan]*, 511 U.S. [825], 834 [1994]." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (emphasis supplied in *Clem*).

50.  In all twenty-three assaults summarized below, prison officials were placed on notice that the victim faced a substantial risk of serious harm, and yet these officials *failed to act* to abate that risk.  Moreover, in many of these incidents, prison officials actually *created* the substantial risk by deliberately moving a prisoner into an area where the officer knew an assault was likely to occur.

### 1.  TODD BUTTERS

51.  Class Plaintiff Todd Butters is 37 years-old.  Butters was convicted of a sex offense and sentenced to the custody of IDOC.  After going through the Receiving and Diagnostic Unit at ISCI to determine his placement, Butters was sent to ICC.  He was placed in J-Pod, a "general population" housing unit.

52.  ICC has identified a number of gangs operating within the facility, known by ICC as "Security Threat Groups" (STGs).  Defendants are aware that members of some gangs will assault members of other gangs due to the level of dislike between gangs. Defendants are also aware that some gangs prey upon certain groups of general population prisoners, including sex offenders and informants (generally known in the prison as "rats" or "snitches").

53.  During 2007, ICC began filling J-Pod with STG prisoners, fully aware that these particular gang members prey on and frequently assault sex offenders and informants. Assigning these STG prisoners to live with sex offenders was like assigning lions to live with lambs.  Over time, many if not most of the sex offenders assigned to J-Pod who did not leave the Pod were assaulted, including Butters and other prisoners listed below.

54.  On or about September 27, 2007, Butters was approached by a prisoner who asked Butters if he was a sex offender.  Butters answered that he was.  The prisoner told Butters that he "hated sex offenders," and informed Butters that he would no longer be permitted to use the J-Pod dayroom and would have to pay "rent" of $5 per week if he wanted to remain in J-Pod unharmed.

55.  Butters told this prisoner that he would not pay rent.  The prisoner left.

56.  A prisoner in J-Pod obtained information that Butters was going to be assaulted.  This prisoner will testify at trial that, despite the risk of being assaulted as an informant, he submitted a Concern Form to prison staff warning them that other prisoners were planning to assault Butters.  The Concern Form was submitted at least two days before Butters was assaulted.  Despite receipt of this warning, staff did nothing to protect Butters.

57. Butters was assaulted on October 5, 2007.  The prisoner who had demanded rent on September 27 returned to Butters' cell and again asked for rent of $5 a week.  When Butters refused, the prisoner started punching Butters in the face and body.  Soon, two other prisoners arrived and they began punching Butters.  Butters collapsed to the ground.  He was asked if he would pay rent.  When he again refused, the three prisoners increased the intensity of their assault, hitting and kicking Butters in the face, ribs, and kidney area.  One blow landed above Butters' left eye, splitting it open to the bone, and blood began gushing out.  The beating lasted several minutes.

58. Had J-Pod been adequately staffed, guards would have heard and observed the beating and taken steps to intervene.  No guards intervened.

59. The next morning, two correctional officers, one of whom was Sgt. Chaney, noticed Butters' injuries and asked him what had happened.  One of the assailants was standing outside Butters' cell at the time.  Fearing retaliation, Butters lied and said he had fallen out of his bunk.

60. Butters was taken to the Unit Manager's Office by Sgt. Chaney and asked about his injuries.  Butters then described the assault.  Chaney told Butters he would review the security video to determine which prisoners had committed the assault.

61. Butters was then questioned about the assault by Counselor Brian Titsworth and Case Manager Justin Acosta.  Afterwards he was handcuffed and escorted to the infirmary.

62. At the infirmary, Butters told the attendants that he was in considerable pain, he had been kicked in the ribs repeatedly, his side hurt when he breathed, and he thought his ribs were broken.

63.    No x-rays were taken after the assault to determine whether any bones were broken or whether Butters needed hospitalization.

64.    The failure of the medical department to take x-rays to determine the extent of Butters' injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

65.    The decision not to take x-rays was made in accordance with ICC policy and custom, discussed above, of seeking to conceal the nature and extent of prisoner injuries resulting from assaults, and to save money that should have been spent on adequate medical care.

66.    Butters was taken to segregation, where he remained for ten days.  While there, he submitted Health Service Requests to the medical department requesting x-rays for his ribs.  These requests were denied.  The only treatment he received was Ibuprofen for five days.

67.    On the third day of Butters' confinement in segregation, Sgt. Chaney visited Butters after receiving a Concern Form from him.  Butters asked Chaney whether disciplinary charges would be filed against his assailants.  Chaney told Butters that they had identified the prisoners who had assaulted him and charges would be filed against them.

68.    A few weeks later, Butters was going to visitation when he saw Chaney.  Butters asked him about the status of the disciplinary charges against his assailants.  Chaney replied: "I am sorry to tell you this, but higher-ups told us to drop the investigation."

69.    Based on information and belief, ICC failed to conduct an adequate investigation followed by a written report to determine whether staff error contributed to this assault.

70.    Only ten days after his assault in J-Pod, Butters was released from segregation and assigned to a cell in L-Pod, which is in the same housing unit as J-Pod.

71.   Tammy McCall was a security officer assigned to J, K, and L Pods.  McCall will testify at trial that it was absolutely reckless for staff to place Butters in L-Pod, given that he had been assaulted in J-Pod.  For one thing, L-Pod was notorious for assaulting sex offenders, and STG members inhabited L-Pod just as they inhabited J-Pod.  Also, having already been assaulted, Butters was now suspected by prisoners of being a "snitch."

72.   McCall witnessed Butters being placed in L-Pod.  She told Butters it was "crazy" to place him there.

73.   McCall immediately contacted Unit Manager Johnson to have Butters reassigned to a different Pod.  Johnson told McCall that he would look into the matter later.  McCall told Johnson that the situation was urgent.  Johnson, however, refused to change his mind.

74.   Johnson's decision was deliberately indifferent to the obvious and immediate risk of injury that Butters faced.

75.   Butters was forced to enter L-Pod.  While Butters was unpacking, a friend of his, prisoner Phillip Fenwick, came to the cell and they began talking.  Thirty minutes later, six prisoners from L-Pod arrived.  They asked Butters and Fenwick what crimes that had committed.  Butters responded that he was a sex offender.  Fenwick refused to answer.

76.   Butters was told by these prisoners not to bother unpacking, as he would not be staying in L-Pod.

77.   The prisoners then viciously attacked Butters and Fenwick.  Butters and Fenwick were punched and kicked in the face and body.  Butters sustained injuries to his face, neck, and back.  (The injuries that Fenwick sustained are discussed later in this pleading.)

78.   As a guard approached, the assailants fled Butters' cell.  The guard had to have seen them flee.  The guard looked directly into Butters' cell.  Despite all the blood on the floor

and splattered on the walls, the guard kept walking.  Butters had to run after him to get him to help.

79.  The guard took the identification cards of Butters and Fenwick and said he would return.  Butters, however, insisted that the guard take him and Fenwick off the Pod.  The guard relented and removed Butters and Fenwick.

80.  Officer McCall was assigned the task of cleaning the blood in Butters' cell after the assault.  McCall will testify that it took her two hours to clean the pools of blood.  McCall interviewed Butters after the assault.  McCall told Butters, "I can't believe they put you on L-Pod."

81.  McCall will testify that guards knew that prisoners such as Butters and Fenwick were at substantial risk of assault in J, K, and L Pods.

82.   McCall will testify that guards would jokingly wonder amongst themselves how long a sex offender would last before being assaulted in J, K, and L Pods.

83. Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

84.   No staff were disciplined as a result of or in connection with the two assaults on Butters, not even the officers who placed Butters in L-Pod.

 **2.  STOCK WARD CHEEVER**

85.  Stock Ward Cheever is 42 years old.

86.  In 2004, Cheever assisted in a "sting" operation in which he wore a recording device that helped convict a person for selling stolen guns.  The defendant in that prosecution was "C.S." (his initials).

87.  Upon his conviction, C.S. was sent to ICC.  Cheever learned that C.S. told some people that he would kill Cheever if he had the chance.

88.  Three years later, Cheever was convicted of a crime.  In April 2008, he was transferred to ICC.

89.  Like most prisons, ICC asks all prisoners at intake to identify any "conflicts" they may have.  ICC administrators, including Defendants herein, know that they have a duty to ensure that known conflicts are not housed within the same living unit, as otherwise violence could result.

90.  During intake at ICC, Cheever filled out a form identifying C.S. as a conflict, informing ICC authorities that C.S. might kill him.

91.  Cheever was assigned to J-Pod, a general population housing unit.  Several days later, despite the fact that Cheever had identified C.S. as a conflict and with clear disregard for Cheever's health and safety, staff moved C.S. into J-Pod and gave him a cell located two cells down from Cheever's cell.

92.  Cheever assumed that C.S. was deliberately placed near him.  Cheever telephoned his family and told them what had occurred.

93.  A week later, on or about April 20, 2008, a prisoner entered Cheever's cell and demanded "rent" of $10 a week and Cheever's commissary items.  Cheever said that he would not pay rent.  The prisoner then punched Cheever in the face and ordered him to open his locked commissary box.  When Cheever refused, the prisoner punched Cheever in the face several more times.  Other prisoners entered the cell and began assaulting Cheever.  Cheever was knocked unconscious.

94.   When Cheever regained consciousness, his assailants had left.  Cheever looked in the mirror.  Several teeth were broken, his face was bruised, and his eyes were swollen.

95.   Just then, C.S. rushed into the cell and began pummeling Cheever, hitting him violently in the face and knocking him to the ground.  Fortunately for Cheever, another prisoner entered the cell and told C.S. to stop hitting Cheever, saying "this inmate had enough." However, the prisoner warned Cheever not to report the assault and told Cheever that he would be assaulted again if he did not start paying rent.

96.   That night, Cheever waited until his cell mate was asleep and managed to give a guard a Concern Form saying that he had been assaulted and feared for his life.  A short time later, he was summoned out of his cell by a guard on the intercom.

97.   Cheever was taken to the multipurpose room, where he was interviewed by staff, including Captain Scott Weibye.  Weibye asked Cheever for the names of his assailants. Cheever was not sure of the names other than C.S.  Weibye said that he would review the video tape and identify the assailants.  Weibye told Cheever that he thought Cheever's nose was broken, and Cheever thought it was broken, too.

98.   Cheever was taken the ICC's infirmary.

99.   No x-rays were taken after the assault to determine whether any bones were broken or whether Cheever needed hospitalization.

100.   Cheever was not properly examined to determine if he suffered a skull fracture, broken ribs, or broken nose, despite the clear medical need of doing so.  Cheever's nose, which Captain Wiebye thought looked broken, was not examined and not reset.

101.   The failure of the medical department to take x-rays to determine the extent of Cheever's injuries constituted deliberate indifference, and was consistent with ICC's

policy and practice of concealing the true extent of injuries suffered in prisoner assaults, and with the motive of saving money.

102.    The next day, Cheever was interviewed by other staff, including Officer Robert Ashcroft and Investigator Brent Archibald, who took photographs of Cheever's face. Archibald showed Cheever some photographs of prisoners who lived in J-Pod.  Cheever did the best he could to identify his assailants.  Archibald told Cheever that the assault would be investigated and that his assailants would be punished.

103.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

104.    Cheever believes that ICC did nothing to punish his assailants.  A year after the assault, Cheever sent a Concern Form to Archibald, asking whether his assailants had been punished.  Archibald responded by claiming that he "was not aware of the assault."

105.    Thus, as will be discussed below, Archibald did the same thing to Cheever as he did to Phillip Fenwick.  Despite taking photographs of the injuries these men suffered and telling both men that he would investigate their assaults, Archibald subsequently told them he had no recollection of the incident.

106.    Apparently, Archibald was unable to locate--or refused to look for--his "investigation" of the Cheever assault.  Perhaps he never conducted one.

107.    As a result of the assault, Cheever lost his two front teeth.  He continues to suffer from occasional headaches and other physical ailments, as well as emotional and psychological trauma.

108.    No staff were disciplined as a result of or in connection with the assault on Cheever, not even the officer responsible for placing C.S. in a cell near Cheever.

### 3.  STEVEN H. DAVIS

109.     Class plaintiff Steven H. Davis is 50 years-old.

110.     During the summer of 2006, under a subpoena, Davis testified for the prosecution against a person in Idaho ("John Doe") on trial for murder.  Davis' testimony was significant.  "Doe" was found guilty of murder and sentenced to imprisonment under the jurisdiction of IDOC.

111.     Davis was also a prisoner under the jurisdiction of IDOC.  In December 2009, Davis was incarcerated at ISCI.  He applied for a transfer to ICC so that he could take a rehabilitative program that was only offered at ICC.  Davis was told, however, that "Doe" was incarcerated at ICC.

112.    Thus, moving Davis to ICC was risky because "Doe" and other prisoners might consider him a "rat" and assault him.

113.     Davis discussed this subject with his counselor at ISCI, Michael Schoen.  Schoen told Davis that for three reasons, it would be safe to enter the rehabilitative program at ICC.  First, Schoen said, the program was located in a separate building at ICC (the "PIE Building") that was detached from the main facility.  Davis would live in the PIE Building and not come in contact with prisoners in the main facility.

114.     Second, Schoen said, in order to qualify to live in the PIE Building, a prisoner must be close to parole eligibility.  "Doe" was not close to parole eligibility and therefore would not be living in the PIE building.

115.     Third, Schoen would enter "Red Flags" into Davis' prison file that would draw the attention of staff to the conflict that Davis had with "Doe."  This would help guarantee, Schoen said, that Davis would not be housed any place other than the PIE Building.

116.    Based on Schoen's assurances, Davis decided to transfer to ICC.  He was moved from ISCI to ICC on December 14, 2009.

117.    When Davis arrived at ICC, however, he was informed by two sergeants on the intake staff that there were no open beds in the PIE Building that day.  Davis explained his predicament to them.  They looked at his computerized file and confirmed the existence of the Red Flags.  They summoned a lieutenant and someone else from the intake office.  However, the four of them told Davis that he could not be moved to the PIE building that day.  They assured Davis he would be moved there the following day.

118.    Davis offered to be housed in Administrative Segregation, but the officers said there were no beds available there, either.  The officers said that Davis could safely be housed for that one night in S-Pod, a general population housing unit.  Reluctantly, Davis agreed.

119.    Soon after Davis entered S-Pod, a prisoner made reference to his testimony against "Doe."  Davis knew he was at risk in S-Pod.  He reported this to staff but they refused to intervene.

120.    Davis was not moved to the PIE Building the next day, and he received no information as to when he would be moved.  Davis informed the guards in S-Pod that he had been told he would be moved that day.  The guards refused to help him.

121.    The following day, while sitting at a table in S-Pod, a prisoner came up behind Davis and violently struck Davis in the side of the face, causing his nose to bleed and his eyes to water.  The blow was painful, his jaw hurt, and Davis was dizzy.  The prisoner ran away before Davis could identify him.

122.    Davis was immediately removed by guards from S-Pod and transferred to a bed in the PIE Building.  Thus, a bed was indeed available.

123.    The officers who placed Davis in S-Pod and those officers who kept him there until he was assaulted exhibited deliberate indifference to his health and welfare.

124.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

125.     No staff were disciplined as a result of or in connection with the assault on Davis.

### 4.  **DANIEL DIXON**

126.    Daniel Dixon is 27 years-old.  Dixon entered ICC in September 2006, and a few days later was placed in J-Pod, a housing unit for general population prisoners.

127.    It was inherently dangerous to place Dixon in J-Pod because he is a vulnerable prisoner, even though he is physically strong.  Indeed, shortly after moving to J-Pod, Dixon was approached by STG members who insisted that Dixon begin paying "rent."

128.    Between September 2006 and December 2007, Dixon was assaulted no fewer than twelve times due to the refusal of ICC staff to place him in a safe housing environment.

129.    Dixon repeatedly begged staff, both verbally and in writing, to move him to a place where he would be safe, including if necessary to Protective Custody.  He submitted at least two dozen Concern Forms, many of which were never answered.  One response he received stated: "You'll be staying where you are."  When he appealed one of his Concern Forms to Chief of Security Wilkerson, Wilkerson called Dixon to his office. Wilkerson explained to Dixon that the reason Dixon was not being sent to Protective Custody was because Dixon would "win" some fights and thus he needed no protection.

130.    After one assault, Unit Manager Brian Doser and Case Manager Justin Acosta asked Dixon to identify his assailants.  When Dixon said that he did not know their names,

these men refused to help him, even though they probably could have obtained their names had they examined the security video tape.

131.     In February 2007, Dixon beseeched Doser to intervene and move him to a safer place. Doser refused, telling Dixon that he was winning many of his fights and should "just keep fighting."

132.     Two months later, Dixon asked Acosta if he could be transferred out of ICC.  Acosta told Dixon that the only way he would leave ICC was "dead, or when his sentence ended."

133.     Dixon told his family about the danger he was in.  Members of his family, including his mother, called ICC to request that Dixon be moved to a place of safety.  His mother called at least six times.  These family members were told that their request would be considered but that assaults sometimes did occur at ICC.

134.     The incident that Dixon feared finally occurred on or about December 14, 2007, when five to seven prisoners entered Dixon's cell.  They attacked Dixon with weapons, including homemade knives and a padlock placed in a sock that can be swung with substantial force.  The attack lasted about five minutes, during which time Dixon repeatedly screamed for help, and also pressed the emergency button in his cell.  Guards surely heard his screams and heard the emergency call, and yet no one came to his aid. Dixon received broken ribs, a slashed face, and broken bones around his right eye.  His eyes swelled shut.  As a result of the attack, Dixon continues to this day to suffer post-traumatic stress and his right eye continues to leak fluid.

135.     While Dixon was dazed, injured, and alone in his cell, two more prisoners entered his cell and robbed him of $200 worth of property at knife-point.

136.    Dixon was afraid to leave his cell, and guards were refusing to respond to his calls for help.  It took nearly two hours after the assault for a guard to help Dixon leave the cell and see a nurse.

137.    Despite his condition, no doctor attended to Dixon.

138.    No x-rays were taken after the assault to determine whether any bones were broken or whether Dixon needed hospitalization.

139.    The failure of the medical department to take x-rays to determine the extent of Dixon's injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

140.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

141.    Dixon was moved to ISCI soon after the assault, a move that should have occurred months earlier.

142.    During the move, the box containing Dixon's Concern Forms, Grievances, and other legal materials was, Dixon was told, "misplaced" by ICC staff.  Dixon notified prison authorities that he was going to file suit to recover his legal materials.  The next day, some of his legal materials were returned, but none of his Concern Forms or Grievances were found.  The materials that were returned were in complete disarray.

143.    No staff were disciplined as a result of or in connection with any of the assaults on Dixon.

**5.  RANDY ENZMINGER**

144.    Class Plaintiff Randy Enzminger is 47 years-old.  Enzminger arrived at ICC in 2007.

145.   Enzminger lived for more than two years on K-Pod without significant incident. During that time, Enzminger watched as ICC placed an increasing number of STG members in K-Pod.

146.   Enzminger witnessed approximately twenty beatings of sex offenders and prisoners suspected of being snitches during his stay on K-Pod, at least half of whom needed medical attention as a result of their assaults.   One victim Enzminger saw was covered with bruises but refused to leave his cell until the bruises healed.  Other prisoners brought food to the victim's cell during that time.

147.   In early March 2009, Enzminger began receiving demands from STG members that he pay "rent" if he wished to live unharmed on K-Pod.  He refused.

148.   Fearing for his safety, Enzminger submitted approximately ten Concern Forms to staff, primarily the Unit Manager, asking to be moved.  He received no response and he was not moved out of K-Pod.

149.   Enzminger was assaulted twice in K-Pod.  The first assault occurred in mid-March 2009, approximately thirty days after he began submitting Concern Forms asking to be moved.  He suffered significant injuries, including a broken nose, deep lacerations on his forehead, possible rib fractures, and chipped teeth.

150.   Enzminger was taken to the prison infirmary.

151.   No x-rays were taken after the assault to determine whether any bones were broken or whether Enzminger needed hospitalization.

152.   The failure of the medical department to take x-rays to determine the extent of Enzminger's injuries constituted deliberate indifference.  Reasonably competent medical

personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

153.   Enzminger requested that x-rays be taken.  One guard laughed at him and asked why he needed x-rays when everyone could see that his nose was broken.

154.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

155.   With clear indifference to his safety, staff returned Enzminger to K-Pod.  He again requested to be moved.  He told staff about the first assault, including Case Managers Melissa Carr and Donald Hudon.  Hudon said it would take a "miracle" to move him.

156.   The refusal of ICC staff to remove Enzminger from K-Pod after his initial assault exhibited deliberate indifference to Enzminger's safety.   Additional violence to Enzminger was reasonably foreseeable.

157.   The second assault occurred on March 29, 2009, approximately two weeks after the first assault.  Two prisoners entered his Enzminger's cell and began beating him, and three more prisoners soon joined in.

158.   The second beating was more severe than the first one.  Enzminger believes that his nose was broken again and some ribs were broken.  He was in terrible pain, and it hurt to breathe due to the pain in his ribs and in his back.

159.   Enzminger was taken to the medical department.

160.   Once again, no x-rays were taken after the assault to determine whether any bones were broken or whether Enzminger needed hospitalization.

161.   The failure of the medical department to take x-rays following this second assault to determine the extent of Enzminger's injuries constituted deliberate indifference.

Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

162.   Photographs were taken of his face.   Enzminger was cleaned up and sent to segregation.

163.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

164.   While Enzminger was in segregation, guards allowed other prisoners to enter his cell and steal his property.

165.   Enzminger was issued a DOR for fighting, consistent with ICC's policy of accusing assault victims of being aggressors.   The DOR was subsequently dismissed by the Hearing Officer.   However, the DOR should never have been issued.   Its purpose was to deflect scrutiny from the guards whose malfeasance caused the second assault to occur.

166.    No staff were disciplined as a result of or in connection with the two assaults on Enzminger, not even against the officer who returned Enzminger to K-Pod after he had already been assaulted there.

## 6.  PHILIP FENWICK

167.   Philip Fenwick is 36 years old.  Fenwick was convicted of a sex offense.  He was sent to ICC on June 6, 2006.

168.   While in county jail awaiting trial, Fenwick was told by other prisoners that ICC is a violent and dangerous prison, especially for sex offenders.   During intake at ICC, Fenwick was interviewed by Psychiatric Technician Charles Fletcher.   Fenwick told Fletcher that he was afraid of being assaulted if he were placed in general population.

169.  With deliberate indifference, Fletcher dismissed Fenwick's concerns and said that Fenwick would have to take care of himself.

170.  A sergeant told Fenwick that he was going to be housed in L-Pod, a general population housing unit.  The sergeant told Fenwick that L-Pod was a "Lion's Den" and a "Gladiator Dorm."

171.  As soon as Fenwick arrived on L-Pod, prisoners asked to see his "papers" that would show the crime he committed.  ("Papers" are commitment papers, which disclose a prisoner's crime.)  Fenwick refused to disclose his papers because he knew it would subject him to retaliation.

172.  It is generally believed by ICC prisoners that a prisoner who refuses to disclose his papers probably committed a sex offense.

173.  Fenwick endured verbal harassment on L-Pod for more than a year.  Four months before he was assaulted, Fenwick told Case Manager Justin Acosta that he feared for his safety.  A few weeks before the assault, Fenwick told both Acosta and Case Manager Brian Titsworth that he feared for his safety.  Neither one provided any help.

174.  Two months before the assault, Fenwick submitted three Concern Forms asking for help and requesting a move to a safer part of the prison.  One was handed to the Housing Sergeant for L-Pod, one to the Unit Manager, and one to Case Manager Acosta.  No responses were received and Fenwick was not moved out of L-Pod.

175.  On October 15, 2007, a friend of his, Todd Butters, was transferred into L-Pod.  Fenwick went to Butters' cell to talk with him.

176.    Fenwick had been speaking with Butters for about thirty minutes when a group of prisoners from L-Pod entered Butters' cell and asked Fenwick for his papers.  Fenwick declined to show his papers.

177.    Suddenly, the group of prisoners began punching and kicking Fenwick.  He was kicked in the mouth so hard that his teeth were pushed through his lower lip.  His nose was broken.  His body was pummeled.  Blood was all over the cell, so much blood that it took Officer McCall nearly two hours to clean it up.

178.    Butters summoned help for Fenwick.  One of the persons responding was Correctional Counselor Michael Kerr, who helped escort Fenwick to the infirmary.  As Kerr was placing handcuffs on Fenwick, Kerr said that he could not understand why ICC housing staff kept putting people in these situations.

179.    Fenwick was taken to St. Luke's Hospital in Boise.  On the way to the hospital, the officer escorting him (Thompson) admitted to Fenwick that some prisoners were being placed in dangerous situations at ICC.

180.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

181.    After Fenwick returned to ICC, he spent three days in the segregated medical unit and was then moved to a safer area of the prison, the area to which he had asked to be moved prior to his assault.

182.    On October 29, 2007, Fenwick sent Concern Forms to Correctional Counselor Kerr and to Case Manager Sara Fink asking them for the identities of the prisoners who had assaulted him and asking what had happened to those prisoners.  Kerr did not reply.  Fink

told him that she was "not aware of how the situation was handled," and suggested he ask Designated Hearing Officer Jeremy Hranac and Case Manager Brandon Delaney.

183.    Following Fink's advice, Fenwick sent Concern Forms to Hranac and Delaney. However, Delaney replied only: "The information is not authorized to be given out." Hranac's Concern Form was given to ICC Investigative Officer Brent Archibald, who stated only: "This is the first I have heard about your assault.  Sorry."

184.    Archibald's reply was disingenuous.  Archibald was ICC's Investigations Officer. Fenwick believes that Archibald was the person who had taken photographs of Fenwick following the assault.

185.    To the best of Fenwick's knowledge, no disciplinary action was taken against the prisoners who assaulted him.

186.    Fenwick has permanent scars on his face from the assault.

187.    Fenwick's assault was entirely preventable.  Numerous employees of ICC were aware of the unacceptably high risk of assault he faced, as a sex offender, in L-Pod.  Moreover, Fenwick told several staff before the assault that he needed protection, and they completely ignored his pleas.  His assault was the product of deliberate indifference.

188.    No staff were disciplined as a result of or in connection with the assault on Fenwick, not even against Acosta or Titsworth.

**7.   MICHAEL HAYES**

189.    Class Plaintiff Michael Hayes is a sex offender.

190.    In September 2006, Hayes was assigned to A-Pod in ICC.  Within minutes of his arrival, Hayes was threatened by several prisoners and told to leave A-Pod because he is a sex offender.

191.   Hayes reported the threat to Unit Manager Brian Doser.  Doser told Hayes he would not be moved.  Hayes objected and was taken to segregation.  While in segregation, Hayes asked Doser and Case Manager Acosta to place him in Protective Custody (PC) due to the threats made against him. Acosta stated that because Hayes had committed a sex offense, he did not deserve PC.

192.   On October 11, 2006, a three-member committee considered whether to grant Hayes' request for PC.  The committee voted to deny the request.  Warden Valdez affirmed that decision the next day.

193.   Hayes was returned to general population.

194.   In March 2007, Hayes was living in K-Pod, a general population housing unit.  He was approached by several STG members and told he would have to pay "rent" if he wanted to continue to live in K-Pod.  Hayes submitted a Concern Form to Case Manager Acosta asking that he be moved for his safety.  Acosta did not reply.

195.   On April 2, 2007, Hayes submitted a Concern Form to Doser advising him of the threats and asking that he be moved.  Doser did not reply.

196.   On April 14, 2007, two prisoners entered Hayes' cell and told Hayes to give them his property for "rent."  Hayes refused.  The men assaulted Hayes.  They had padlocks in their fists and repeatedly hit Hayes in the face and torso.  They stopped to steal Hayes' property and Hayes ran out of his cell.  Hayes ran up one set of stairs and then down another set of stairs pursued by one of his assailants.  Guards should have observed the chase but no one intervened.

197.   Hayes was overtaken by his assailant near the showers and beaten again.  He was punched and kicked.  (A portion of the assault, Hayes was later told, was captured on

video.)  Hayes managed to push the emergency button, but guards ignored it.  Finally, Hayes was able to reach the foyer door and exited the Pod.

198.    Hayes suffered lacerations, bruises, and swelling.  Hayes was taken to medical and placed in segregation for two days.

199.    No x-rays were taken after the assault to determine whether any bones were broken or whether Hayes needed hospitalization.

200.    The failure of the medical department to take x-rays to determine the extent of Hayes' injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

201.    The prisoners who assaulted Hayes were placed in segregation for ten days but were released without being charged and without being required to return the property they stole from Hayes.

202.    Hayes' assault could easily have been prevented had staff taken adequate precautions to protect him.  The failure to take those precautions was deliberate indifference.  In addition, his assault could have been stopped had K-Pod been adequately staffed with a sufficient number of trained guards.

203.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

204.    No staff were disciplined as a result of or in connection with the assault on Hayes.

**8-9   LARRY and ARTHUR HOAK**

205.    Larry Hoak is 56 years-old.

206.    Hoak was moved to L-Pod in 2006.  Hoak, who is not a sex offender, did not start having problems in L-Pod until early 2008, when Hoak's cell mate started complaining about his snoring.  Hoak was afraid that the situation could become violent and he told Sgt. Christopher Rose (Defendant herein), Officer Ashcroft, Dr. Khatain, and Dr. Garrett that he wanted to be moved to avoid a conflict.  However, his requests were denied.

207.    Hoak believes his cell mate convinced gang members to assault him.

208.    In February 2008, while Hoak was sleeping, two prisoners entered his cell and assaulted him.  Hoak was repeatedly kicked in the head and badly beaten.  The assailants also robbed him, taking nearly $100 in property.  No staff interrupted the assault.

209.    After the assailants left, Hoak pushed the emergency button and guards saw his injuries.  He was taken to see Dr. Garrett, who provided no treatment.

210.    No x-rays were taken after the assault to determine whether any bones were broken or whether Hoak needed hospitalization.

211.     The failure of the medical department to take x-rays to determine the extent of Hoak's injuries constituted deliberate indifference.   Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

212.    Hoak was taken to segregation.  Hoak remained in segregation for a week and was sent to A-Pod.

213.    The assault was the product of staff's deliberate indifference.  They failed to take reasonable steps to protect Hoak.

214.    Hoak believes that guards knew which prisoners assaulted him.  However, to Hoak's knowledge, these prisoners were not issued DORs or punished in any fashion.

215.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

216.   Hoak was also assaulted a second time due to the deliberate indifference of staff. Approximately six weeks after the first assault, a prisoner stated in front of several other prisoners that he was going to assault Hoak.  Hoak immediately reported this threat to staff, including a sergeant, but no one did anything to protect him.

217.   The prisoner who threatened to assault Hoak did, indeed, assault him a few days later. The prisoner cornered him in the bathroom, took a handicap railing off the wall, and smashed Hoak's head with it several times, sending blood flying.

218.   Hoak needed twelve staples to close the wounds in his scalp.  Hoak suffers from dizziness, memory loss, headaches, and trauma, and has a large contusion on his head.

219.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this second assault.

220.    No staff were disciplined as a result of or in connection with the two assaults on Hoak.

221.   The next month, Larry Hoak's brother, Arthur, was transferred to ICC.  Larry saw Arthur the day he arrived.  Larry was extremely concerned for his brother's safety and believed that Arthur would likely be assaulted.  Arthur looks a lot like Larry and Larry was convinced that the same prisoners who assaulted him, or other members of their gang, would also assault Arthur.

222.   During the next 72 hours, Larry informed numerous staff, including Sgt. Rose (Defendant herein), Unit Manager Rodriguez (Defendant herein), Investigator Archibald, C.O. Ashcroft, Case Manager Hudon, Correctional Counselor Todd Goertzen, and Dr.

Khatain about his concern for his brother's safety. He expressed these concerns daily to everyone with whom he came into contact, asking that Arthur be transferred out of ICC. Larry sent at least five Concern Forms to Rose and Rodriguez, but received no responses.

223.   Larry also told Dr. Garrett about his fears. At Larry's request, Dr. Garrett telephoned Warden Valdez (Defendant herein) and left a message explaining that Larry Hoak believed that Arthur would be assaulted if he remained at ICC.

224.   These warnings were ignored. Not only was Arthur not removed from ICC but Arthur was assigned to L-Pod, the very pod in which Larry had been assaulted the previous month.

225.   The decision to assign Arthur to L-Pod was reckless and callous.

226.   Arthur looks very much like Larry. While in segregation, two guards who had seen Larry in segregation the month before, thought Arthur was Larry.

227.   When Arthur was moved to L-Pod, he could sense that prisoners thought he was Larry. Prisoners were giving him dirty looks and harassing him. Arthur knew from speaking with Larry and Larry had been assaulted in L-Pod, and Arthur told Sgt. Rose (Defendant herein) and Unit Manager Rodriguez (Defendant herein) that he was afraid of also being assaulted, and asked to be moved.

228.   The day of Arthur's assault, he again asked Defendant Rodriguez to move him. Rodriguez told him that she had entered an "alert" to have him returned to ISCI but that he needed to remain in his cell for now. (Subsequently, two officials at ISCI have told Arthur that there is no indication that anyone placed any "alerts" in his file.)

229.   Obeying Rodriguez's instructions, Arthur returned to his cell in L-Pod. Not long after, three prisoners entered his cell and demanded that he pay rent. They began

punching him and kicking him, and told him that he should expect more beatings unless he started paying rent.  He was kicked in the face so hard that the shoe left an imprint. Blood was coming out of his ear.  He had significant pain in his neck and back.

230.    An officer arrived (Alumbaugh) and she took Arthur to the infirmary.  She told Arthur that she had seen the assailants flee from his cell and she knew who they were, and that she would make sure they were charged with disciplinary infractions.  However, based on information and believe, Arthur's assailants were not charged or convicted of any disciplinary offense.

231.    Arthur was not seen by a doctor even though blood was coming out of his ear, he had been kicked so hard in the head that the shoe print was visible, and he had a terrible pain in his head.

232.    Photographs were taken of his face.  But no x-rays were taken after the assault to determine whether any bones were broken or whether Hoak needed hospitalization.

233.    The failure of the medical department to take x-rays to determine the extent of Hoak's injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

234.    X-rays should have been taken of Arthur's face, neck, and back.

235.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

236.    After the assault, Arthur was placed in W-Pod where he had no further incidents, and a few weeks later, was returned to ISCI.

237.   Arthur had x-rays taken at ISCI.  They showed swelling behind his left eye and scar tissue in his left ear.  To this day, Arthur has difficulty hearing out of that ear.  He also continues to suffer emotional and psychological trauma stemming from the assault.

238.   ICC staff easily could have--and should have--protected Arthur Hoak from this assault.  The assault was the product of deliberate indifference.

239.    No staff were disciplined as a result of or in connection with the assault on Arthur Hoak.

**10.   ANTONEY JONES**

240.   Antoney Jones is African-American and gay.  While awaiting trial in early 2007, he was housed in the Ada County Jail in Boise, Idaho.

241.   Sensitive to Jones' safety, the Ada County Jail placed him in a protective custody housing unit, where Jones was kept apart from prisoners prone to assault gay prisoners, African-American prisoners, and prisoners considered "rats."

242.   Had staff at ICC exhibited the same concern, Jones would not have been assaulted at ICC.

243.   After his conviction in February 2007, Jones was sent to ICC.  Jones arrived at ICC in March 2007 and was assigned to N-Pod.  Soon afterwards, Jones decided to testify against a criminal defendant in a California prosecution.  When he returned to N-Pod, some prisoners considered him to be a "rat."

244.   After receiving a DOR and spending time in administrative segregation, Jones was informed that he was being moved to K-Pod.  Jones had heard while in the Ada County Jail that J, K, and L Pods were "Gladiator Pods," in which prisoners often were assaulted.

245.    Soon after his arrival in K-Pod, Jones was threatened by prisoners.  He reported these threats to staff but no one did anything to protect him.  Finally, Officer Tammy McCall issued him a DOR for a minor offense because, as she will testify, she knew it would result in Jones being removed to segregation where he would be safe.

246.    Unfortunately, segregation was only a temporary reprieve.  After he completed his sentence in segregation, Jones was notified that he was being moved to J-Pod, along with another prisoner from segregation known to Jones only by the name of "Moose."  Both Jones and "Moose" told the officer escorting them that they feared for their safety if they were placed in J-Pod, but the officer refused to help them.

247.    While under escort to J-Pod, Jones saw Sgt. Ashcroft, who was assigned to monitor the hall.  Jones told Ashcroft that he was afraid he would be assaulted in J-Pod.  Ashcroft took Jones to see Sgt. Amy Shapherd.  Jones told her about his fears.

248.    Shapherd and Ashcroft told Jones that his fears were not enough to prevent the move, and that something would have to happen to Jones in J-Pod before he would be moved.  The officers conducted no investigation; they simply placed him in J-Pod.

249.    Tammy McCall was a correctional officer at ICC during this period of time, assigned to J, K, L Pods.  McCall worked a different shift than the one during which Jones was moved to J-Pod.

250.    McCall will testify that Jones should never have been housed in J-Pod, that it was reckless for Shapherd and Ashcroft to permit him to be placed there, and that these officers had to have known that Jones would likely be assaulted in J-Pod.  Jones' prison file would show that the risk of assault in J-Pod was extremely high given Jones' suspicion of being a "rat," and the fact that he is gay and African-American.

251.    Shaperd and Ashcroft knew that J-Pod was filled with gang members, and that moving Jones into that Pod was exceedingly dangerous.

252.    Immediately after his arrival in J-Pod, Jones noticed that prisoners in nearby cells appeared to be conferring about him and kept going up and down the stairs. Approximately thirty minutes later, Jones's cellmate claimed that he wanted Jones to leave the cell while the cellmate used the toilet. Jones left the cell and sat on a chair near the telephone.

253.    Within minutes, a prisoner walked up to Jones and hit him violently in the face. Prisoners throughout the Pod lined the rails and began yelling "Kill the nigger," "Get the fag," and "Kill the rat." It was a mini-riot, and yet no guards intervened.

254.    Moose came to Jones' rescue and separated the assailant from Jones. However, other prisoners immediately attacked Moose and he was badly beaten. Jones ran to his cell and closed the door, locking it.

255.    Jones could observe a guard watching from a window as Moose was being assaulted. It was several minutes before officers entered the Pod, during which time Moose continued to be attacked.

256.    Jones was in great pain and he was bleeding from his nose, and he continued bleeding from his nose for the next half-hour. He believed that his nose was fractured. His face was swollen and both eyes turned black and blue.

257.    Jones was taken to the prison infirmary.

258.    No x-rays were taken after the assault to determine whether any bones were broken or whether Jones needed hospitalization.

259.    The only medical care Jones received was being issued cotton balls to place in his nostrils to stem the bleeding and some ibuprofen for the intense pain, which remedies were inadequate.  The failure to take x-rays was the product of deliberate indifference.

260.    Jones was placed in segregation without being offered additional medical care.  Jones felt desperate, depressed, and forsaken.  Three days later, while still in the segregation cell, Jones attempted suicide by tying bed sheets around his neck.  Jones lost consciousness.  Fortunately, a guard saw him and cut him down.  Jones was taken to St. Luke's Hospital, where he remained for several hours before being returned to ICC.

261.    Jones does not know if Moose required medical attention.  Jones has not seen Moose since the incident.  However, Moose's intervention saved Jones from additional injury.

262.    Jones was never interviewed concerning the incident and he believes it was not investigated.  Soon after his release from segregation, a Disciplinary Hearing Officer told Jones that no charges would be filed against the prisoner who had assaulted him because the incident was viewed as "mutual combat."

263.    The assault on Jones was not "mutual combat."  Jones offered no resistance.  ICC employees pretended it was "mutual combat" in order to avoid the responsibility of having placed Jones in a dangerous environment.  ICC, as it did with many other assaults, sought to conceal the malfeasance of staff that contributed to this violent incident.

264.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

265.    No staff were disciplined as a result of or in connection with the assault on Jones, not even Shapherd or Ashcroft.

**11.  MATTHEW KNAPP**

266.    Matthew Knapp is 34 years old.  Knapp is a sex offender.

267.    Knapp entered ICC in April 2007.  In July 2008, while Knapp was residing in H-Pod, he was threatened by another prisoner.  The prisoner referred to Knapp's offense and told him: "I'm going to get you" and "Watch your back."

268.    Knapp knew that the threat was real and that he was in danger.  He immediately told Officer Johnson (now Unit Manager Johnson) about the threat and begged to be transferred to another housing unit or another Idaho prison.  Knapp told Johnson that he did not know the name of the prisoner who had threatened him but that he would gladly look at photographs and identify him.  Officer Johnson, however, refused to help Knapp. Acting with deliberate indifference, Johnson told Knapp that he would not move him.

269.    Less than forty-eight hours later, the prisoner who had threatened Knapp assaulted him.  The assault occurred in the chow hall.  Knapp was attacked from behind and never saw it coming.  He was thrown to the ground and punched and kicked in the face, resulting in the eventual loss of three teeth, a broken nose, and lacerations that required eighteen stitches.  He was knocked unconscious.  When he regained consciousness, he was in St. Luke's Hospital, where he was treated for his injuries.  He was returned to ICC a few hours later.

270.    Three days later, medical personnel at ICC pulled three of Knapp's teeth to prevent infection.  Knapp continues to suffer neck pain and headaches as a result of his beating.

271.    In a subsequent conversation with Officer Johnson, Johnson assured Knapp that ICC would replace his three teeth.  After several months went by and ICC hadn't replaced his

teeth, Knapp sent a Concern Form to Johnson reminding him of his assurance.  Johnson responded by saying that ICC would not replace his teeth.

272.    After his assault, Knapp was moved to V-Pod in the West Wing of ICC, and he had no further difficulties.

273.    Had Johnson taken reasonable precautions to prevent the assault, as he should have, and moved Knapp to V-Pod sooner, the assault could have been prevented.

274.    As a result of deliberate indifference, guards allowed prisoners known to be a threat to sex offenders to enter the dining facility with Knapp.

275.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

276.    There have been numerous assaults in the ICC dining hall.  ICC supervisors fail to assign enough staff to monitor the dining hall and, as a result, many errors are made and many assaults occur, such as the one on Matthew Knapp in July 2008.

277.     Officer Johnson was not disciplined as a result of or in connection with the assault on Knapp.

## 12.   CLARENCE KNIGHT

278.    Clarence Knight is 26 years-old.  Upon arrival at ICC in March 2009, Knight informed intake staff that he was affiliated with a particular STG.

279.    Exhibiting deliberate indifference and extreme carelessness, Knight was assigned to live in J-Pod, a general population housing unit filled with members of an STG in constant battle with the STG in which Knight belongs.

280.    Within ten minutes of arrival on J-Pod, Knight was attacked by up to seven members of the opposing STG.  Knight was punched and kicked at least fifteen times in the head

and body. Knight believes that a lock was placed in a sock and that he was hit in the head with this weapon. Knight needed more than twenty stitches to close the wounds on his head (and the scars are still visible on the back of his skull). He had lumps on his face and his eyes were black and blue.

281. No x-rays were taken after the assault to determine whether any bones were broken or whether Knight needed hospitalization for a skull fracture.

282. The failure of the medical department to take x-rays to determine the extent of Knight's injuries constituted deliberate indifference and was motivated by a desire to conceal the extent of Knight's injuries.

283. Due to the chronic understaffing, the assault was not observed or halted by ICC staff. Knight had to summon help by pushing the emergency button in his cell.

284. Knight was taken to segregation following the assault. A few days later, ICC's Gang Coordinator, Travis Bergquist, visited Knight in segregation. Bergquist admitted that placing Knight in J-Pod was a mistake. He told Knight that he had not been at work the previous day and that, had he been, Knight would not have been assigned to J-Pod.

285. Knight was also visited by Deputy Warden Prado on the same day. As with Bergquist, Prado apologized to Knight for the error.

286. Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

287. The staff who assigned Knight to J-Pod were not disciplined.

### 13.  SPENCER MASCHEK

288. Spencer Maschek is 39 years old. He was convicted in November 2008 of aiding and abetting in the commission of arson.

289.   On June 15, 2009, during his classification hearing at ISCI, Maschek notified IDOC personnel, including Case Manager Benson and Corporal Lun, that he would be in grave danger if housed near his co-defendant, "P.M." (his initials).  Maschek was assured that this information would be noted in his permanent file and that he would be kept apart from P.M.

290.   On October 26, 2009, Maschek was informed that he was being moved to ICC the next day.  Maschek repeated to staff, including Officer Maldonado, of the need to keep him separated from P.M.

291.   Apparently, Maldonado notified the Shift Lieutenant of the problem because that same evening the Lieutenant asked Maschek about the conflict.  Maschek told him about his fear of being assaulted if he were placed near P.M.  Present in the room was Corporal Parker.  Parker pulled up P.M.'s records and said that P.M. was at ISCI.  Everyone then assured Maschek that he would be separated from P.M. by going to ICC.

292.   The next day, October 27, 2009, when Maschek was boarding the transport vehicle to ICC, he saw that P.M. was being moved to ICC with him.

293.   Immediately upon arriving at ICC, Maschek notified every guard he saw that a terrible mistake had been made and that he must be kept apart from P.M.  One guard, Livi, assured Maschek that she would speak with a supervisor about the situation and that he could count on someone contacting him very soon.

294.   Maschek also told the medical personnel during intake about the dangerous error that had been made, stating that he was now experiencing great anxiety.  As did Livi, these ICC employees assured Maschek that they would report this information and that Maschek was certain of being spoken to by staff about it.

295.    Maschek was then interviewed by the mental health specialist.  Maschek once again reiterated his anxiety about being housed with P.M.  Maschek was told that a psychiatrist would visit him that evening.  No psychiatrist visited him.

296.    Maschek was assigned to X-Pod, a general population housing unit.  After waiting a few days and not being summoned by anyone regarding the error that had occurred, Maschek submitted a Concern Form on October 30, 2009 requesting help.  The request was ignored.

297.    Four days later, on November 3, 2009, Maschek was brutally assaulted in his cell by four prisoners, one of whom, Maschek believes, was P.M.  In other words, not only did ICC housing personnel fail to ensure that Maschek would be kept apart from P.M., they actually placed the two of them in the same housing unit.

298.    Maschek was struck in the face, then in the back of the head knocking him to the ground.  Once knocked down, Maschek was repeatedly kicked and stomped in the head and torso.  After the assault, he was told that if he did not go to Protective Custody, he would be killed.

299.    No officers intervened.  Had X-Pod been adequately monitored and adequately staffed, officers would have noticed the altercation and could have intervened.

300.    As a result of the assault, Maschek was lying in a pool of blood and suffered a broken nose, cracked cheek bone, bruised jaw, his lips were split open, multiple lacerations, sharp pains in his kidneys, and bruises and abrasions all over his body.  Maschek urinated blood for over a month after the attack.  He set his nose back into position.

301.    The assailants told Maschek that they would assault him again if he reported the incident.  Maschek knew that many of the guards at ICC were unwilling to protect him

and indifferent to his safety, and therefore he did not immediately report the assault. Finally, during the noon meal the following day, Maschek reported the assault.

302.    Maschek was taken to medical but received no treatment or painkillers.

303.    No x-rays were taken after the assault to determine whether any bones were broken or whether Maschek needed hospitalization.

304.    Maschek was placed in Administrative Segregation.  He was issued a DOR even though he was the victim.

305.    While in segregation, Maschek submitted numerous concern forms requesting clean clothing and medical care.  These requests were ignored.  He was given no medicines of any kind, not even ibuprofen.  Maschek went three weeks without a change of clothes.

306.    Maschek remained in segregation for seven weeks.  While in segregation, Maschek suffered from kidney stones.  Every day, he told staff that he had severe pain in his left side.  Finally, after three weeks of begging and two days of vomiting, a guard summoned a nurse.  The nurse had Maschek provide a urine sample, which contained blood.

307.    Maschek was moved to the prison infirmary and given an IV for dehydration.  Some four days later, Maschek finally was x-rayed, which confirmed the likelihood of kidney stones.  However, despite repeated requests, Maschek was not permitted to see a doctor, and he never saw one the entire time he was in segregation or in the infirmary.

308.    Maschek's assault could easily have been prevented, and should have been prevented. Numerous employees were alerted to the high risk of assault Maschek faced.  Due to inadequate training, inadequate supervision, and deliberate indifference, ICC employees allowed this assault to occur.

309.     Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

310.     Consistent with the policy and practice of Valdez to issue DORs to the victims of assault, Maschek was issued a DOR for fighting.  The video tape of this incident would show that Maschek was assaulted by multiple prisoners, and there is no credible evidence to support a charge of fighting.  At his hearing, Maschek told the Hearing Officer exactly what had occurred.  Nevertheless, the Hearing Officer found him guilty of fighting, sentenced him to fifteen days in segregation and to a loss of commissary and visitation privileges for sixty days.

311.     Although Maschek was recently transferred to another facility, he continues to suffer from post-traumatic anxiety and depression with night tremors.

312.     No staff were disciplined as a result of or in connection with the assault on Butters, not even the staff who placed Maschek and P.M. in the same housing unit.

### 14.   JAMES PARMER

313.     James Parmer is 51 years old.  He was convicted of a sex offense.

314.     Parmer entered ICC on November 21, 2006.  During intake, Parmer told Psychiatric Technician Charles Fletcher that he was afraid of being assaulted because he had heard that ICC was a "Gladiator School" in which sex offenders often were assaulted.  Fletcher told Parmer: "Just don't let anyone know that you're a sex offender."  Fletcher also recommended that Parmer "watch out" for prisoners demanding "rent."

315.     Parmer was assigned to K-Pod, a general population housing unit.  It was well known by ICC staff that sex offenders frequently were assaulted in K-Pod.  Parmer should not have been assigned there.

316.    As soon as Parmer arrived at K-Pod, he met a sex offender who told him that sex offenders in K-Pod were often assaulted and, because of that, this prisoner was afraid to leave his cell.

317.    As Parmer approached his cell, his cellmate asked him if he was a sex offender. Parmer admitted he was.  The cellmate replied, "Get ready, you're about to get a beating."

318.    Parmer immediately went to nearby guard, told him what had just happened, and said that he feared for his life.  Parmer asked to be moved.  The guard replied: "All I'm going to do is get you to dinner."  The guard said that doing anything else for Parmer would "create problems" for the guard.

319.    Parmer was too scared to eat dinner.   On the way back to K-Pod from the dining hall, Parmer approached two guards standing together and told them he would be beaten if he returned to K-Pod.  Parmer begged them for protection.  One of the guards said: "We already know about your situation," as if they had been discussing how long it might take before Parmer was assaulted.  The guard advised Parmer to "face up to it."  Parmer looked at the second guard and asked, "Should I just go and be beaten?"  The guard shrugged his shoulders.

320.    Parmer realized he would be assaulted when he returned to K-Pod, so he removed his glasses and placed them in his sock.  As soon as Parmer reached his cell, a prisoner told him he needed to leave K-pod.  Parmer told him that he had tried to get moved but guards would not allow it.  The prisoner then punched Parmer in the mouth, knocking him back onto his bunk bed and rendering him barely conscious.

321.   Another prisoner entered the cell and both men beat and kicked Parmer in the face and torso for several minutes.  Parmer was punched and kicked more than twenty times. They left Parmer lying on the floor bleeding profusely and severely injured.

322.   No officer came to intervene, despite being aware of the danger they knew Parmer faced and despite Parmer's earlier requests for help.  It is possible that these guards watched the assault and chose not to intervene.

323.   Parmer believes he had a broken nose, broken bones around his left eye and cheek, fractured ribs, and damaged vertebrae. Parmer could barely open his mouth.  His face was bleeding.  He pushed the emergency button.

324.   Two officers arrived, placed him in handcuffs, and took him to the infirmary.

325.   Several guards entered the room to gawk and laugh at Parmer, one of whom was the guard who had told Parmer to "face up" to the beating.  When this guard saw Parmer's bleeding face, he smiled and sarcastically offered to fix Parmer's broken nose.

326.   Parmer asked to see a doctor and requested that x-rays be taken.

327.   No x-rays were taken immediately after the assault to determine whether any bones were broken or whether Parmer needed hospitalization.

328.   The failure of the medical department to take x-rays to determine the extent of Parmer's injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

329.   Parmer received no medical care at this time.  Photographs were taken of his face.

330.   A sergeant asked Parmer to provide the names of the prisoners who had assaulted him.   Parmer didn't know their names.   He had only arrived in K-Pod minutes earlier. Parmer would gladly have disclosed the names of his assailants had he known them.

331.   Parmer was stripped of all his clothing except his shorts and sent to segregation.

332.   Parmer was in excruciating pain.   He submitted Concern Forms requesting aspirin.   It took six days before he received any.

333.   Parmer finally got to see a doctor after nearly a week in segregation.   However, the doctor only reached his hands through the "bean slot" in the door and felt some of the broken bones in Parmer's face.

334.   The doctor did not perform a physical examination of Parmer, as he should have.   The failure to provide a physical examination constituted deliberate indifference.

335.   Apparently, the doctor ordered x-rays taken of Parmer's face--but only his face-- because the next day Parmer had x-rays taken of his face.   Parmer was not told the results of the x-rays.

336.   Apparently, the doctor also prescribed pain killing medication for Parmer.   A few days after the doctor left, a female delivered pain medication to Parmer and told him that the doctor had prescribed the medicine but that staff "had missed" seeing those instructions.

337.   After fourteen days in segregation, Parmer was moved to ISCI.

338.   The long term effects of the assault are permanent facial nerve damage, lapses of memory, cognitive deficits, chronic headaches, nose bleeds, and psychological and emotional trauma.   It still hurts his face when he shaves.   Additionally, previous work Parmer had to fix a deviated septum was destroyed.

339.    Parmer's assault was the product of deliberate indifference by staff.

340.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

341.     No staff were disciplined as a result of or in connection with the assault on Butters, not even the officer who assigned him there or the officers who turned down his requests for protection.

## 15-19.     JOSE PIÑA, JOE ROCHA, JOSHUA KELLY, RAY BARRIOS, and ANDREW IBARRA

342.    As noted earlier, ICC contains rival STGs whose members often assault one another if provided the opportunity.  (Matthew Knapp's assault illustrates this.)

343.    ICC employees ask prisoners during intake whether they are affiliated with a gang. Those who admit affiliation with a particular STG are typically assigned to live in a housing unit that does not contain known members of rival gangs.

344.    On October 9, 2009, ICC employees transferred three prisoners who they *knew* were affiliated with a particular STG--Plaintiffs Rocha, Kelly, and Ibarra--to a living area they *knew* was occupied by a rival STG.  Thus, staff *deliberately* placed these three prisoners at substantial risk of physical injury.  This move was objectively unreasonable.

345.    The result was predictable.  While Plaintiffs Rocha, Kelly, and Ibarra were in the cafeteria to eat their first meal, up to fifteen members of the rival STG attacked them. All three plaintiffs suffered physical injuries; Ibarra was struck in the head with such force, he was knocked unconscious, and Rocha suffered a severe injury to his knee.

346.   ICC employees knew that a fight was likely.  One employee brought a video camera to the cafeteria to record it.  Plaintiff Ibarra, on the way to the cafeteria, overheard a guard tell another guard: "Something is going to happen."

347.   As soon as these three prisoners were informed by ICC employees that they were being moved to that area, they beseeched those employees to change their minds.

348.   Plaintiff Rocha asked Correctional Counselor Malcom Beach, Case Manager Cheryl Courtwright, and Officer Johnson not to move him.  Beach turned to Johnson and said, "Maybe we had better not move him."  However, Rocha was moved anyway.

349.   Plaintiff Kelly asked his counselor, Sara Fink, not to move him.  With deliberate indifference to his health and safety, Fink told Kelly that unless he moved, she would recommend to the Parole Commission that Kelly remain incarcerated for his entire sentence, and that she would have Kelly taken to segregation.

350.   Plaintiff Ibarra asked Beach, Courtwright, and Officer Harold not to move him. Beach replied that Ibarra would be issued a DOR unless he obeyed the order to move.

351.   Plaintiffs do not know whether the ICC Gang Coordinator, Travis Bergquist, was consulted regarding the move of these three prisoners.  However, he should have been consulted and he should have strongly recommended against the move.

352.   These three plaintiffs were moved at approximately 2:30 p.m. on October 9, 2009, and they were assaulted a few hours later in the cafeteria.

353.   At the time these assaults commenced, Plaintiffs Piña and Barrios happened to be seated in the cafeteria near Rocha, Ibarra, and Kelly.  They are not affiliated with an STG.  However, they were assaulted, too.

354.   Plaintiffs Piña and Barrios were innocent bystanders.

355.   ICC has a policy and practice of issuing DORs to the victims of assault in order to hide the prison's own errors.   Consistent with this practice, all five victims of these assaults were issued DORs for fighting.

356.   At their hearings, Plaintiffs Rocha and Ibarra requested that two of the employees with whom they had spoken, Beach and Courtwright, be called to testify.   However, these witnesses declined to attend the hearings, and the Hearing Officer proceeded to rule in their absence, finding both Rocha and Ibarra guilty as charged.

357.   Plaintiff Ibarra appealed his conviction to Defendant Valdez.   Valdez *admitted* in his response that Ibarra had "advised staff of [his] concerns" about being assaulted. Nevertheless, Defendant Valdez affirmed the convictions, although he reduced the severity of the infraction.

358.   Plaintiff Piña explained during his DOR hearing that he was an innocent bystander and a victim.   Nevertheless, Plaintiff Piña was convicted of fighting.

359.   The DOR against Plaintiff Kelly was dismissed by the Hearing Officer.   The other four Plaintiffs were convicted as charged, although their charges and punishments were reduced on appeal.   The DORs, however, should never have been issued in the first place, and the Hearing Officer should have dismissed all of them.

360.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to these five assaults.

361.    No staff were disciplined as a result of or in connection with these assaults, not even Courtwright, Beach, or Fink.

362.   The Idaho Commission of Pardons and Parole, whose members are defendants herein, had already approved Plaintiff Piña for release on parole beginning May 5, 2010 pending

the completion of his programs.  Piña, however, was recently notified by the Commission that his parole has been rescinded and he must remain in prison until the end of his sentence--an additional *two years and six months* of incarceration.  The revocation was based, the Parole Commission said, on Piña's "recent serious DOR" which had been issued following his assault on October 9, 2009.

363.    Similarly, when Plaintiff Kelly appeared before the pre-parole hearing officer, Ms. St. Paul, on December 29, 2009, St. Paul brought up the DOR for fighting and appeared to hold the DOR against Kelly, even though he was a victim and even though his DOR had been *dismissed.*  St. Paul recommended that Kelly serve at least one more year before he could reapply for parole.  On March 9, 2010, Kelly appeared before the members of the Commission of Pardons and Parole (Defendants herein).  He was asked about his DOR.

364.    The Parole Commission had previously recommended that Plaintiff Barrios be released from prison to reside in a community work center (CWC) when his classification points dropped.  As a result of his DOR conviction, however, Plaintiff Barrios' points increased and he lost his chance to be released to a CWC.

365.    During a pre-parole hearing, Plaintiff Ibarra was asked by the Hearing Officer if he had been convicted of any disciplinary infractions.  Ibarra had not had a single DOR conviction in five years except for the DOR he received on October 9, 2009.  Ibarra told the Hearing Officer about the recent DOR.  Judging by what has happened to Piña and Kelly, the October 9, 2009 DOR will likely have negative consequences for Ibarra.

366.    Thus, as a result of the deliberate indifference of ICC employees in moving Plaintiffs Rocha, Kelly, and Ibarra, and the indefensible decision of other ICC employees to issue DORs to all five Plaintiffs, these Plaintiffs are now saddled with demonstrably

detrimental reports in their prison files, reports that will harm their chances of parole. Indeed, as a result of the recent decision of the Defendant Parole Commissioners, Plaintiff Piña must now remain incarcerated two additional years based on a senseless and vindictive policy and practice of issuing DORs to the victims of assault.

367.   The members of the Commission of Pardons and Parole, defendants herein, ignore their statutory and constitutional duties when they assign negative consequences to DORs such as those issued to Plaintiffs Piña, Rocha, Kelly, Barrios, and Ibarra.

## 20.   MARLIN RIGGS

368.   Plaintiff Marlin Riggs is 47 years-old.

369.   In May 2008, Riggs was living in L-Pod at ICC.  L-Pod was a general population housing unit.

370.   As noted earlier, beginning in 2007, ICC assigned an increasing number of prisoners affiliated with STGs to Pods J, K, and L.

371.   Defendants knew by 2007 that STG members often steal property from non-members and charge them "rent," and that they enforce their demands with violence.

372.   By May 10, 2008, Riggs had been living on L-Pod for some fifteen months.  Riggs had seen numerous assaults--nearly one a day--on L-Pod.  For instance, Riggs witnessed the brutal assaults on Larry Hoak and, later, on Arthur Hoak in L-Pod.  Riggs feared that he eventually would be targeted.

373.   On the evening of May 10, 2008, Riggs was approached in his cell by prisoners whose names he did not know.  They told Riggs that unless he started paying "rent" to live in L-Pod, he would be beaten.  They then stole Riggs' stereo headphones, two boxes of hobby-craft items, and all of his consumable commissary items.

374.    The following evening, at least four prisoners returned to Riggs' cell and told him that he must either leave the Pod or be prepared to fight all of them.

375.    Riggs took this threat very seriously.  He knew he would be assaulted unless he left the housing unit.  Riggs told the prisoners he would leave the Pod, and he pressed the emergency button located in front of Pod Control.

376.    The emergency call was received by Correctional Officer (C.O.) Johnson in the Control Center.  Riggs advised Johnson that he needed to leave the Pod.  Officer Johnson opened the necessary doors for Riggs to exit the Pod.

377.    Once outside the Pod, Riggs was met by C.O. Dean, defendant herein.  Dean took Riggs to the multipurpose room.  Riggs nervously told Dean what had transpired and begged Dean to transfer him to another housing unit.  Dean asked Riggs to name the prisoners who had threatened him.

378.    Riggs informed Dean that he did not know the prisoners' names.  Riggs said that Dean could examine the video tape from the security camera to identify the prisoners, or Dean could show Riggs the photographs of L-Pod prisoners that are kept in the Control Center and Riggs would identify them.

379.    Dean, however, refused to do either of those things.  Instead, he ordered Riggs to return to his cell so that, Dean explained, he could watch what happened and identify the prisoners threatening or assaulting Riggs.

380.    Riggs refused to return to his cell, as he was sure he would be assaulted.  Riggs asked to speak with the Unit Sergeant.

381.    A short time later, Sgt. Rose arrived, defendant herein, and interviewed Riggs.  Rose had been the Gang Coordinator at ICC and thus was particularly knowledgeable about

gang activities, the threat that STGs posed, and the fact that numerous prisoners had been assaulted in J, K, and L Pods by STG members.  Rose also knew that gangs often strong-arm prisoners for "rent."

382.    Riggs told Rose what had happened, including the fact that his property had been stolen, that he had been ordered to pay rent, and that he had just been threatened with assault.  Riggs was extremely nervous and he asked Rose to remove him from L-Pod.  Rose asked Riggs to identify the prisoners who had threatened him.  Riggs told Rose that he did not know their names but that Rose could examine the security video tape or show him photographs and Riggs would identify them.

383.    Rose could easily have helped Riggs, and should have helped Riggs.  At the very least, Rose should have placed Riggs in a safe environment and conducted an investigation to determine whether Riggs might be at risk if he returned to his cell.

384.    Instead, Rose became belligerent.  He seized on Riggs' inability to identify the prisoners and used it as an excuse, a pretext, for avoiding his own constitutional duties.  He called Riggs a "son-of-a-bitch," accused Riggs of wasting his time, and told Riggs to "get out of my f****** sight."  Rose told Riggs that unless he returned to his cell, he would receive a DOR for failing to obey a direct order.

385.    Riggs knew that a DOR would hurt his chances for parole and would become a permanent mark against him.  He felt forced to return to his cell, even though he knew it meant being assaulted.

386.    As he left the room, Riggs saw C.O. Danforth, defendant herein.  Riggs told Danforth the danger he was in and begged Danforth to summon the Captain.  Danforth refused.

387.    Defendants Dean, Rose, and Danforth had to have known that Riggs faced a high risk--if not a 100 percent likelihood--of assault in returning to his cell.

388.    At the time that Riggs entered L-Pod, the other prisoners were at dinner.  Riggs had access to the telephone in the Pod, and he called his family.  He told them what had happened, how the guards refused to help him, and that he would likely be assaulted.

389.    Riggs subsequently requested that ICC preserve the tape of the telephone call he made on May 11, 2008, to his family.  Riggs received written confirmation that the tape will be preserved.

390.    If ICC notifies the Court that this tape has been destroyed, Plaintiff Riggs will accuse ICC of deliberately destroying significant evidence that ICC told Riggs would be preserved.

391.    Riggs finished his telephone call and returned to his cell.  Within moments, he was attacked and savagely beaten by prisoners.  After being knocked to the floor, Riggs was repeatedly kicked in the face and torso.  His nose was broken and the left side of his face was smashed in.  Blood was all over the cell, including on the ceiling.

392.    Defendant Dean, who had told Riggs to return to his cell so that Dean could identify the assailants, watched the assault unfold and entered L-Pod (although not very hurriedly).  According to the incident report that Dean subsequently wrote, as Dean approached Riggs' cell, he saw a prisoner flee while another prisoner continued to kick Riggs.  By the time Dean reached Riggs' cell, Riggs "was laying face down on the blood covered floor" while this prisoner continued to kick him.

393.    Eventually, Dean was able to get this prisoner to stop kicking Riggs.  Riggs was placed in handcuffs and taken to the prison infirmary.

394.    The doctor who examined Riggs confirmed that his nose was broken.  The doctor attempted to reset it by wrenching it back towards the center of Riggs' face.  However, the doctor refused to order x-rays, even when Riggs requested them, and no x-rays were taken.

395.    Based on information and belief, the doctor who examined Riggs was Steven Garrett, and Garrett left his job at ICC the following day.

396.    The failure of the medical department to take x-rays to determine the extent of Riggs' injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

397.    The failure to take x-rays of Riggs' extensive facial injuries was consistent with ICC's efforts to conceal the severity of injuries suffered by the victims of assault and to save money in violation of sound medical and penological practice.

398.    By failing to take x-rays, ICC overlooked, ignored, and failed to treat the broken bones in Riggs' face.

399.    Riggs should have been taken to the emergency room of the local hospital, given the severity of his injuries.

400.    After seeing the doctor, Riggs was taken to administrative segregation, where he remained for fifteen days.

401.    During those fifteen days, Riggs was constantly bleeding from the nose, bones in his face were loose, there was a noticeable dent in his face, he was bleeding from the ears and nose, and he had difficulty breathing.  When he slept, Riggs would lie in a pool of blood.  Riggs was in enormous and constant pain.

402.   As a result of the broken bones in his face, it hurt Riggs to eat.  Riggs would experience shooting pain in the roof of his mouth each time he chewed.

403.   Staff issued Riggs a DOR for disruptive violence, even though Riggs was the *victim*-- and not the aggressor--of an assault.

404.   The issuance of a DOR to Riggs served no legitimate penological function.  It was motivated entirely by a desire to conceal the truth by deflecting scrutiny away from the guards whose malfeasance contributed to the assault.

405.   The DOR issued to Riggs was eventually dismissed by ICC.

406.   No evidence existed then or exists now to accuse Riggs of having initiated the altercation on May 11, 2008, that gave rise to his injuries or to believe that he was anything other than a victim of an unprovoked assault.

407.   While in administrative segregation, Riggs repeatedly requested to be supplied with Concern Forms and with Grievance Forms so that he could request medical care and commence the grievance process.  These requests were denied.

408.   During the time that Riggs was in segregation, Defendant Norma Rodriguez, the Unit Manager of J, K, and L Pods, ordered staff to escort Riggs to her office.  When he arrived, Rodriguez asked Riggs if he knew anything about efforts made by his family to contact officials following the telephone call Riggs had made on May 11.  Riggs told her that he was unaware of any efforts they might have made.

409.   During the conversation, Riggs told Rodriguez what had happened to him and how officers had refused to protect him.  Rodriguez responded with indifference.  It was clear to Riggs that Rodriguez's only concern was to find out if Riggs' family was making any

complaints about the way Riggs had been treated, and she was not concerned about whether her subordinates had committed malfeasance in failing to protect him.

410.    Indeed, when Riggs told Rodriguez that he thought he had been assaulted by STG members, Rodriguez seemed to accept that as likely.  She pointed to a huge stack of files on her desk and told Riggs that they were files of known gang members at ICC.

411.    Rodriguez conducted no investigation into the incident, and commissioned no written report or findings, despite Riggs' allegations that officers had failed to protect him.

412.    During their conversation, Riggs also told Rodriguez that he desperately needed medical attention, and that the guards in the segregation unit were refusing to provide him with Concern Forms and Grievance Forms.

413.    Rodriguez did not arrange for Riggs to receive any medical care.

414.    Had Rodriguez properly performed her responsibility to investigate earlier assaults in J, K, and L Pods, she could have prevented the assault on Riggs.

415.    The failure of Rodriguez to adequately investigate prior assaults in her housing units, to reach a reasoned conclusion regarding them, and to take effective remedial action to prevent their recurrence, exhibits deliberate indifference to the safety of all prisoners in her housing units.

416.    The entry into Riggs' cell on May 11, 2008, by prisoners not assigned to that cell should have been observed by guards (and, Riggs believes, *was* observed by Defendant Dean), who should have taken swift action to halt the assault.  Had L-Pod been adequately staffed, the assault on Riggs could have been prevented or at least interrupted much sooner, sparing Riggs many of the injuries he suffered.

417.   To this day, Riggs suffers from blurry vision, headaches, pain, discomfort, and mental trauma.  Riggs has a dent on the left side of his face because ICC refused to provide adequate medical care.

418.   Riggs was denied medical care for so long that when he finally was taken to see an ear, nose, and throat specialist some six months after the assault, the doctor stated that Riggs needed an operation immediately.  Yet due to additional unnecessary delay by ICC, Riggs was forced to wait another three months before he was given an operation to permit him to breathe normally.

419.   All of the acts and omissions that occurred in connection with the assault on Marlin Riggs, including the placement of Riggs in an unsafe environment; the failure and refusal of guards to appropriately respond to his pleas for protection; the failure to provide proper medical care following the assault; the failure to adequately investigate the assault; the failure to discipline the employees whose malfeasance contributed to the assault; and the issuance of a DOR to Riggs were the direct and proximate result of policies and practices of defendants CCA and Warden Valdez.

420.   As noted above, it is the policy and practice of the Idaho Commission of Pardons and Parole to take into account in determining parole eligibility the DORs issued to the victims of assault.  Riggs was hurt by this policy and practice.

421.   During Riggs' hearing in 2009 before the Parole Commission, the Commission repeatedly referred to the DOR that had been issued to Riggs following his assault on May 11, 2008.  The Commission referred to the incident as a "fight" and clearly held this "fight" against Riggs.

422.     Riggs told the Commission that there had been no "fight" but, rather, that he had been attacked.  Riggs also told the Commission that he had asked officers to remove him prior to the assault and that they had refused to remove him.  Riggs told the Commission the truth about the incident, but the Commission did not believe him.  Riggs was denied parole.

423.     Riggs does not know if his assailants suffered any punishment as a result of assaulting him.  Riggs, however, was not called to testify either in a courtroom or in a disciplinary hearing against his assailants.

424.     About nine months after the assault, Warden Valdez entered the Pod where Riggs was residing.  Riggs complained to Valdez about the assault and told him that the assault should have been prevented.  Valdez refused to discuss the incident.

425.     Despite having been notified by Riggs that ICC officers had failed to protect him from a vicious assault, Valdez neither investigated Riggs' complaint nor commissioned an investigation.

426.     No staff were disciplined as a result of or in connection with the assaults on Riggs, not even Rose, Dean, or Danforth.

427.     A few days after this conversation, one of the prisoners who had assaulted Riggs on May 11, 2008, was moved a few cells away from Riggs.  Whether Valdez did this deliberately, Riggs does not know.  Fortunately, there were a number of prisoners in that Pod who supported Riggs, and his assailant did not assault him a second time.

428.     Riggs filed a *pro se* case in federal court against ICC.  Not long after, Riggs was transferred to the South Idaho Correctional Institution (SICI), and not long after that, he was transferred to the St. Anthony Work Center (SAWC).

429.    Riggs believes that these transfers were done in retaliation for his legal efforts.  While Riggs was at SICI, he became a driver for the fire crew, creating an institutional need to keep him at SICI.  As a result, SICI staff inserted a "No Move" directive in his central file, indicating that Riggs was needed at SICI.

430.    Soon after arriving at SAWC, Riggs asked staff why he had been moved to SAWC.  Riggs was told there was an "institutional need" to have him at SAWC.  This response was a pretext.  There was and is no institutional need for Riggs to be housed at SAWC.  Indeed, Riggs was not assigned a job for weeks after his arrival at SAWC.  The primary reason why Riggs was moved was to discourage his access to the courts.

431.    Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

432.    The acts of Defendants Valdez, Rodriquez, Rose, Dean, and Danforth set forth above proximately caused injury to plaintiff Riggs and were an extreme deviation from reasonable conduct.  These acts were willfully and deliberately performed by defendants with oppression, wantonness, and maliciousness, and with complete disregard for the federal rights of plaintiff Riggs and of society as a whole.

## 21.  LARRY SITTNER

433.    Larry Sittner is 60 years-old.

434.    Sittner entered ICC in August 2000 after being convicted of a sex offense.

435.    On or about March 1, 2004, Sittner was housed in B-Pod and was assaulted in his cell.  He pressed the emergency button during the assault but no one came to his aid, and no one came afterwards to check on his health.  Several days later, someone else apparently reported the assault, and Sittner was interviewed by Sgt. Rose, defendant

herein.  Sittner told Rose what had happened.  As far as Sittner knows, no investigation was conducted, and staff concealed the incident.

436.    Sittner was assigned to J-Pod in March 2006.  As noted above, in 2007 ICC began assigning an increasing number of STG members to J, K, and L Pods.  Placing sex offenders in J-Pod exhibited deliberate indifference to their health and safety.  Serious violence against these sex offenders was reasonably foreseeable.

437.    On or about May 22, 2007, ICC assigned a known STG member to share a cell with Sittner.  This decision was reckless and deliberately indifferent to Sittner's welfare.

438.    Within ten minutes, the new cellmate viciously assaulted Sittner.  Sittner was punched on the side of his head so hard that his left ear became partially detached from the side of his head, and his jaw was injured.  He was in enormous pain.  Even today, Sittner has ringing in his ears, chronic neck pain, and his jawbone pops.

439.    Sittner went to the infirmary.  He received a very cursory examination.

440.    No x-rays were taken after the assault to determine whether any bones were broken or whether Sittner needed hospitalization.

441.    The failure of the medical department to take x-rays to determine the extent of Sittner's injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

442.    ICC took no disciplinary action against the prisoner who assaulted Sittner.

443.    No disciplinary action was taken against the officer who had assigned a known STG member to share a cell with Sittner.

444.   Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

445.   Immediately following the assault, Sittner was moved to L-Pod, which is in the same housing unit as J-Pod.  This is precisely what staff did to Todd Butters: they moved him to L-Pod after having been assaulted in J-Pod.  This was senseless and reckless.

446.   Sittner was in L-Pod from May 23, 2007 to February 28, 2008.  While in L-Pod, Sittner observed beatings almost daily and did not feel safe, and he was frequently threatened with assault.  He submitted at least eight Concern Forms asking to be moved. Among the staff he told about the threats he was receiving were Green, Swanson, Rodriguez (defendant herein), Acosta, and Titsworth.  Most of his Concern Forms were unanswered.  The only answer he ever received said "We cannot move you."

447.   On February 28, 2008, an STG member approached Sittner in L-Pod and told him he had to leave L-Pod.  Sittner immediately reported this to staff and, fortunately, this time he was removed.

## 22.  BRIAN SPAUDE

448.   Class Plaintiff Brian Spaude is 47 years old.

449.   From 2005 to 2008, Spaude acted as an intern for the Therapeutic Community (TC) at ICC.

450.   Interns in the TC program obtain information during the course of their work that might be incriminating to other prisoners.  As a result, it is unfortunately the case that some ICC prisoners view TC interns as informants.  Spaude knows of several former TC interns who were assaulted because other prisoners viewed them as informants.

451. Indeed, ICC officials are aware of the substantial danger of assault that TC interns face, and have arranged for TC interns to be housed separately in the West Wing and to eat meals at separate times from general population prisoners.

452. In a disastrous breach of policy and procedure, on November 17, 2009, a guard permitted general population prisoners to enter the dining facility while Spaude was eating his meal.  As soon as one of these prisoners noticed Spaude in the room, this prisoner put down his tray and, as guards watched, circled behind Spaude and violently struck him on the side of the face, shattering his jaw and knocking him unconscious.

453. Spaude does not know for certain why his assailant assaulted him.  But one thing is clear: the guards who allowed general population prisoners to enter the dining facility while Spaude was present exhibited deliberate indifference to Spaude's health and welfare.

454. The guards whose misconduct contributed to the assault on Spaude were not disciplined.

455. Based on information and belief, ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this assault.

456. Officer French, who watched the video replay of the assault, told Spaude that he wondered why general population prisoners had been allowed into the dining room while residents of West Wing were there.

457. Brian Spaude has eight screws in his jaw.  His teeth had to be wired together to promote healing.  During his recovery, Spaude was fed a liquid diet through a straw and lost twenty-two pounds.  He continues to suffer physical and mental trauma.

458.   There have been numerous assaults in the ICC dining hall.  ICC supervisors fail to assign enough staff to monitor the dining hall and, as a result, many errors are made, such as the one that resulted in the assault on Brian Spaude.

### 23.   RICHARD WILLIAMS

459.   Richard Williams entered ICC in July 2006.  He was assigned to L-Pod.

460.   As with Butters, Fenwick, Sittner, and others, it was not until 2007 that Williams first began experiencing significant problems on L-Pod concerning his personal safety.

461.   In early September 2007, Williams was assigned by unit officers to be the Chemical Porter for J, K, and L Pods, which required him to monitor and control the use of cleaning supplies for all janitors assigned to those Pods.

462.   Within the first three days of his employment, Williams was asked by several prisoners to hold contraband drugs, tobacco, and commissary items in the Chemical Room and to deliver them to other prisoners.  Williams refused because he did not want to violate prison regulations.

463.   On November 11, 2007, two prisoners approached Williams in his cell and told him that if he refused to help them distribute these contraband items, he needed to transfer out of the North Wing of ICC or he would be assaulted.  The North Wing includes Pods A, B, C, G, H, I, J, K, and L.

464.   Williams immediately went to the Pod Control Officer and informed her of what had transpired and asked for help.  However, the officer told Williams that she needed to arrange for prisoners to leave the Pod for dinner, and she asked Williams to return later.  After dinner, Williams again asked the officer for assistance.   The officer stated she was

the only officer on Pod Control and would try and help him a little later when it was not so busy.

465.    Had L-Pod been adequately staffed, the Pod Control officer could have assisted Williams immediately.

466.    Williams then headed to the Chemical Room.  He stopped at a table in the Multipurpose Room directly in front of the Chemical Room and began doing some paperwork.  Sitting nearby was a prisoner with a walking cane.

467.    Suddenly, another prisoner entered the room, grabbed the walking cane, and began beating Williams with the cane and with his fists.

468.    The assault lasted over five minutes before ICC staff arrived to stop the assault.  Had L-Pod been adequately staffed, guards could have intervened sooner.

469.    As a result of the assault, Williams suffered multiple lacerations, contusions, and abrasions on his forehead, arms, back, ribs and upper torso.   Williams was taken to the infirmary.

470.    No x-rays were taken.

471.    The failure of the medical department to take x-rays to determine the extent of Williams' injuries constituted deliberate indifference.  Reasonably competent medical personnel, given the nature of the assault and the patient's symptoms, would have taken x-rays.

472.    Williams remained in pain for at least two months after the assault.

473.    ICC failed to conduct an investigation followed by a written report to determine whether staff error or inadequate staffing contributed to this assault.

474.   On January 28, 2008, approximately four months after the assault, Williams received a subpoena to testify against one of his assailants, who was being charged with a felony in state court.  A few hours later, while Williams was in the ICC Dining Hall, a prisoner approached him and warned that if Williams testified at the criminal trial, he would be assaulted again.

475.   Williams immediately notified staff in writing of this threat.

476.   Williams received no reply for approximately two weeks.  Finally, Alcohol Treatment Manager Susan Barker called Williams out of his housing unit to speak with him about the threat. Barker also spoke with Williams on two later occasions concerning his safety. The only thing she advised was for Williams to remain inside the housing unit.

477.   However, Williams needed to eat in the dining room.  Due to staff indifference and neglect, prisoners who might attack Williams were allowed into the dining room while Williams was eating.  On June 23, 2008, Williams was assaulted during breakfast. Williams was attacked from behind while filling his water glass.  He suffered a black eye, lacerations on his head, and multiple bruising.  In addition, he suffered an asthmatic reaction to the OC Spray that guards used to stop the attack, and he had difficulty breathing.

478.   ICC failed to conduct an investigation followed by a written report to determine whether staff error contributed to this second assault.

**Additional Assaults at ICC**

479.   The twenty-three assaults listed here are merely representational of scores--indeed, hundreds--of assaults that have occurred at ICC during the past four years.  Many assaults have occurred at ICC during the past ninety days alone, which are not

summarized here.  These include at least one stabbing, and several assaults in D-Pod when guards either mistakenly or deliberately opened the wrong doors, allowing prisoners to assault other prisoners.

480.    In January 2010, a particularly vicious assault occurred in the PIE building that resulted in the hospitalization of the victim, who appears to have suffered permanent brain damage.  While four guards and one counselor observed from behind windows, a prisoner grabbed another prisoner and smashed his head into the wall more than ten times.  When the victim fell to the ground, the assailant then stomped on his head more than twenty times.  The assailant stopped the attack and walked about twenty feet to a drinking fountain.  The victim, bleeding profusely, picked himself up, went to the door, and begged to be let out.  The guards would not open the door.  When the assailant saw this, he returned to the victim and beat and kicked him further until the victim was convulsing on the floor.  This entire assault was entirely preventable.  Guards knew that the victim was considered to have "snitched" against some prisoners in the PIE Building.  The last place this prisoner should have been placed was the PIE Building.  The victim was assaulted within minutes of his arrival.

481.    Just yesterday (March 10, 2010), several assaults occurred in separate areas of ICC simultaneously, apparently initiated by one STG in a coordinated and calculated assault against members of a rival STG.  At least one of the victims required emergency medical attention at the local hospital.

482.    Unnecessary and entirely preventable assaults will continue to occur at ICC, as they have been occurring for years now, unless ICC administrators, including Defendants herein, accept and act upon their constitutional duty to take all reasonable steps to protect

prisoners from assault by other prisoners, and unless IDOC Director Brent Reinke begins to exercise his responsibility to ensure that IDOC prisoners incarcerated at ICC are reasonably protected against assault by other prisoners.

## FIRST CLAIM FOR RELIEF

483.   Based on the facts set forth above, named plaintiff Marlin Riggs asserts that Defendants Valdez, Rodriguez, Rose, Danforth, Dean, and Corrections Corporation of America, Inc., enacted and/or pursued or acquiesced in the policies and practices set forth above, and engaged in the acts described above, which resulted in a violation of rights secured to him by the Eighth and Fourteenth Amendments to the U.S. Constitution. Riggs seeks compensatory and punitive damages against those defendants jointly and severally pursuant to 42 U.S.C § 1983.

## SECOND CLAIM FOR RELIEF

484.   Based on the facts set forth above, the plaintiff class of all current and future prisoners of ICC assert that CCA, Warden Valdez, and their employees at ICC have been and are pursuing the policies and practices described above, the result of which is to deprive them of rights guaranteed by the Eighth and Fourteenth Amendment to the U.S. Constitution.

485.   As a result of these policies and practices, the named plaintiffs and the plaintiff class are being denied reasonable protection from assault.  These policies and practices include the failure to hire an adequate number of staff; to adequately train staff; to adequately investigate each prisoner assault to determine whether it could have been prevented by staff and whether staff misconduct or malfeasance caused or contributed to the assault; to issue adequate written findings, conclusions, and recommendations after each assault; to

eliminate the code of silence that pervades ICC; to ensure that noncompliant or untrained staff receive the discipline they deserve or additional training they need to prevent unnecessary violence at ICC; to adequately punish the violent offenders who assault prisoners; and to provide adequate medical care to the victims of assault.

486.    The named plaintiffs and the plaintiff class also assert that Defendant Brent Reinke is failing and refusing to properly exercise his duties as Director of the IDOC to ensure that ICC provides reasonable protection from assault to all IDOC prisoners incarcerated at ICC.

487.    Relief is sought pursuant to 42 U.S.C § 1983.

## THIRD CLAIM FOR RELIEF

**488.**    Based on the facts set forth above, plaintiffs assert that the defendant members of the Idaho Commission of Pardons and Parole have violated rights of the named plaintiffs, and are likely to violate rights of the plaintiff class in the future, by imposing negative consequences on prisoners seeking parole based on Disciplinary Offense Reports (DORs) that have been fabricated and are devoid of merit.  ICC staff pursue a policy and practice of issuing DORs to the *victims* of assault--when these victims have committed no wrongdoing--in a deliberate effort to deflect scrutiny away from staff malfeasance and misconduct.  By imposing negative consequences based on these DORs, the defendant Commissioners violate rights secured to plaintiffs under Idaho statutory law and under the Eighth and Fourteenth Amendments to the U.S. Constitution.  Relief is sought pursuant to 42 U.S.C § 1983.

## FOURTH CLAIM FOR RELIEF

489.    Based on the facts set forth above, the named plaintiffs and the class they represent assert that the defendants are violating their rights under the Eighth and Fourteenth Amendments by pursuing a policy and practice of failing and refusing to take x-rays and to provide adequate medical care to the victims of assault.  Defendants refuse to provide these medical necessities in a deliberate scheme to conceal the injuries suffered by these victims and to avoid the expense of providing needed medical care.  Plaintiffs seek appropriate declaratory and injunctive relief pursuant to 42 U.S.C § 1983.

## PRAYER FOR RELIEF

WHEREFORE plaintiff respectfully prays that this Honorable Court will:

1.  Accept jurisdiction over this cause.

2.  Grant Plaintiff Riggs pursuant to 42 U.S.C. § 1983 compensatory damages against defendants Valdez, Rodriguez, Dean, Rose, Danforth, and Corrections Corporation of American, Inc., jointly and severally, in an amount as the proof will show at trial.

3.  Grant Plaintiff Riggs pursuant to 42 U.S.C. § 1983 punitive damages against defendants Valdez, Rodriguez, Dean, Rose, Danforth, and Corrections Corporation of American, Inc., jointly and severally, in the amount of $155,000,000.00 (one hundred fifty-five million dollars), which is approximately the net income of CCA for the year 2009, to punish these defendants and to discourage them and other similarly situated persons and entities from engaging in this type of reprehensible conduct in the future.

4.  Grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 in favor of the plaintiffs and the class they represent, declaring that the defendants have violated and ignored their duties under the Eighth and Fourteenth Amendments to the U.S. Constitution with

respect to the protection of the named plaintiffs and the plaintiff class from unnecessary and preventable assault by other prisoners.

5.   Issue injunctive relief on behalf of Plaintiffs Piña, Rocha, Ibarra, Kelly, and Barrios, and on behalf of the class of prisoners they represent, pursuant to Rule 65 of the Federal Rules of Civil Procedure, ordering Defendants Valdez, Rodriguez, Danforth, Dean, Rose, and CCA to take all reasonable steps to ensure that prisoners at ICC will be protected against unnecessary and preventable assault by other prisoners.   Defendants should be ordered, among other things, (a) to hire an adequate number of staff; (b) to adequately train staff; (c) to adequately investigate each prisoner assault to determine whether it could have been prevented by staff and whether staff misconduct or malfeasance caused or contributed to the assault; (d) to issue adequate written findings, conclusions, and recommendations following each assault as to whether the assault could have been prevented; (e) to ensure that noncompliant or untrained staff  will receive the discipline they deserve or additional training they need to prevent unnecessary violence at ICC; (f) to ensure that incident reports, documents, and logs are properly made and retained regarding incidents of prisoner assault; (g) to take all reasonable steps to eliminate the code of silence that pervades ICC; (h) to ensure that the victims of assault receive proper medical care for their injuries; (i) to expunge all references in prison files to DORs (regardless of their outcome) issued against prisoners, including the named plaintiffs, who were the victims of assault; (j) to report all assaults resulting in significant injury to local law enforcement officials, including those assaults that appear to be hate crimes; and (k) to ensure that all proposed housing moves of prisoners will be reviewed by the ICC Gang Coordinator prior to implementation.  In addition, Defendant Reinke should be ordered to make certain that ICC promptly implements corrective measures

to ensure that IDOC prisoners are reasonably protected against assault and will receive adequate medical care for injuries sustained from an assault, and to ensure that all IDOC prisoners will be removed from ICC if those results are not achieved within a reasonable period of time.

6.   Grant appropriate declaratory and injunctive relief against the defendant members of the Idaho Commission of Pardons and Parole, directing that they cease to give any credence whatsoever to a DOR issued by ICC staff in connection with a prisoner-on-prisoner assault unless the Commission has conducted an independent investigation into its validity. In addition, the Court should direct these defendants to consider the parole applications of the named plaintiffs (and to reconsider the parole applications of Plaintiffs Riggs and Piña) in a manner that *entirely* disregards and considers as null and void the DORs they received in connection with their assaults.

7.   Grant such additional and further relief, including the award of attorney's fees and costs, as the Court may deem proper under the circumstances.


        DATED this 11th day of March, 2010.



                                    _____
                                    Stephen L. Pevar
                                    Lea C. Cooper
                                    James D. Huegli

                                    Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2010, I electronically filed the foregoing Second

Amended Complaint with the Clerk of Court using the CM/ECF system which sent a notice

of electronic filing to the following persons:

Kirtlan G. Naylor
Naylor & Hales, PC
950 W. Bannock St., Suite 610
Boise, ID  83702

Paul Panther
Deputy Attorney General
Idaho Department of Correction
1299 N. Orchard, #110
Boise, ID  83720-0018

John Burke
Hall, Farley, Oberrecht & Blanton, PA
P.O. Box 1271
Boise, ID  83701

Steve Groom
Deputy General Counsel
Corrections Corporation of America (CCA)
10 Burton Hills Blvd.
Nashville, TN  37215

Michael Elia
Special Deputy Attorney General
Idaho Department of Correction
Moore, Baskin & Elia, LLP
P.O. Box 6756
Boise, ID  83707


/s/ Stephen L. Pevar_____