UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARLIN RIGGS, individually, and JOSE PIÑA, JOE ROCHA, ANDREW IBARRA, JOSHUA KELLY, RAY BARRIOS, and RANDY ENZMINGER, individually and on behalf of a class of all other persons similarly situated, | Case No. 1:09-CV-010-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| PHILLIP VALDEZ, NORMA RODRIGUEZ, CHRISTOPHER ROSE, STEVEN DANFORTH, and WILLIAM DEAN, individually and in their official capacities, and CORRECTIONS CORPORATION OF AMERICA, Inc., | |
| Defendants. | |

**INTRODUCTION**

Pending before the Court in this prisoner civil rights matter is Defendants' Motion to Dismiss Second Amended Complaint. (Dkt. 73.) Defendants argue that the Court must dismiss the claims brought by Plaintiffs Piña, Rocha, Ibarra, Kelly, Barrios, and Enzminger because they failed to exhaust administrative remedies properly, as required by 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA"). (Dkt. 74, p. 1.) Defendants do not seek to dismiss Plaintiff Riggs's individual claims for monetary

damages.

After considering the parties' written and oral arguments, and the relevant portions of the record, the Court will grant Defendants' Motion in part and deny it in part. The Court concludes that (1) Plaintiffs Ibarra and Barrios may remain as representative plaintiffs, at least temporarily; (2) each plaintiff must have exhausted available administrative remedies before he joined the case and raised claims against Defendants, but not before the date that Riggs filed the original Complaint; and (3) Defendants have carried their burden to prove that these six plaintiffs failed to properly exhaust claims that they were denied adequate post-assault medical care (Third Claim for Relief) and that Rocha did not exhaust any claim for relief, but Defendants have not established that the "failure to protect" claims raised by Ibarra, Piña, Barrios, Kelly, and Enzminger should be dismissed for lack of exhaustion (Second Claim for Relief).

## BACKGROUND

Marlin Riggs initiated this lawsuit by filing a pro se Complaint on January 12, 2009, alleging that prison employees and officials at the Idaho Correctional Center ("ICC") had failed to protect him from violence and were deliberately indifferent to his serious medical needs, in violation of his Eighth and Fourteenth Amendment rights. (Dkt. 3.) The Court first consolidated but later severed other cases raising similar claims, and then appointed counsel to represent Riggs. (Dkt. 11.)

With the assistance of counsel, Riggs filed an Amended Complaint on March 11, 2010, adding inmates Ibarra, Piña, Rocha, Kelly, and Barrios as new plaintiffs. (Dkt. 16.)

In the amended pleading, all plaintiffs alleged that Defendants had failed to protect them from assault and then concealed pervasive violence at ICC. Riggs sued on his own behalf and requested monetary damages, while the new plaintiffs proceeded both individually and on behalf of all similarly situated inmates at ICC, seeking declaratory and injunctive relief. (Dkt. 16, pp. 78-80.)

On June 30, 2010, the Court gave Plaintiffs leave to amend the Complaint a second time. (Dkt. 70.) In the Second Amended Complaint, a seventh plaintiff was joined, Randy Enzminger, who raised the same claims and sought the same declaratory and injunctive relief as the five other purported class representatives.[1] (Dkt. 71.)

Defendants now seek dismissal of the claims brought by all plaintiffs except Riggs.

## MOOTNESS

The Court will first address Defendants' argument that two plaintiffs, Ibarra and Barrios, lack standing to continue as potential class representatives. Defendants assert that because Ibarra has been released on parole, his claims for declaratory and injunctive relief are now moot. (Dkt. 74, p. 10.) In their Reply, Defendants also include Barrios in their request, noting that he has been transferred to another facility. (Dkt. 85, p. 10.) Plaintiffs do not dispute that the individual claims of Ibarra and Barrios are moot, but they assert that these plaintiffs can continue as potential class representatives, at least temporarily.

---

[1] Plaintiffs also dropped all claims against personnel of the Idaho Department of Correction, leaving only ICC/Corrections Corporation of America Defendants.

**MEMORANDUM DECISION AND ORDER - 3**

To be justiciable, a plaintiff's claim must not have become moot during the litigation. *American Civil Liberties Union v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008). As a general rule, a prisoner's transfer or release will moot all personal claims for injunctive relief because the prisoner is no longer subject to the allegedly unconstitutional policy. *Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991).

Prisoner class action litigation can present unique mootness issues, given the possibility that a named plaintiff seeking injunctive relief on behalf of a putative class will be released or transferred. The Supreme Court has recognized an exception to mootness when a claim with class-wide implications is so inherently transitory that the case may become moot before the court has a reasonable time to rule on a motion for certification. *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975); *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). To ensure that the merits will not evade judicial review, the district court's decision on the certification issue will "relate back" to the filing of the complaint when the individual claims were not moot. *See McLaughlin*, 500 U.S. at 52; *see also Wade v. Kirkland*, 118 F.3d 667 (9th Cir. 1997) (if claims are inherently transitory, then "action qualifies for an exception to mootness even if there is no indication that [plaintiff] or other current class members may again be subject to the acts that gave rise to the claims.").

**MEMORANDUM DECISION AND ORDER - 4**

This Court finds the circumstances in the present case to fall within the inherently transitory category. In the short time since the Amended Complaint was filed, two named plaintiffs have already been released or moved from ICC. In light of the shifting nature of an inmate population with varying sentences in a state with several prisons, there is a danger that additional representative plaintiffs may also be released or transferred from ICC at any time.

Moreover, in *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402 (1980), the Supreme Court concluded that a named plaintiff in a potential class action who had standing at the inception of the case continues to have a personal stake in the outcome of the class certification issue apart from his legal interest in the substantive claim for relief. *Id.* at 403. Here, Ibarra and Barrios had standing when they entered the case and they retain a personal stake in the certification issue despite the fact that their individual claims have since become moot. *Cf. Rosetti v. Shalala*, 12 F.3d 1216, 1232 (3d Cir. 1993) (holding that a proposed class representative has a stake in the certification issue at the time he moves for certification, regardless whether his or her personal claim is later mooted).

Accordingly, Ibarra and Barrios may continue as representative plaintiffs at this time.

## EXHAUSTION

Defendants next contend that Ibarra, Piña, Rocha, Kelly, Barrios and Enzminger did not properly exhausted their available administrative remedies, as required by the

PLRA.

The Court is not convinced by Defendants' argument that each plaintiff must have exhausted all administrative remedies by the date that Riggs filed the original Complaint. In addition, while the Court agrees that none of these plaintiffs exhausted a claim that they were deprived of adequate post-assault medical care, Defendants have failed to carry their burden to show that Ibarra, Piña, Barrios, Kelly, or Enzminger did not exhaust available remedies for the failure to protect claims in this case. Only Rocha shall be dismissed as a named plaintiff based on his failure to exhaust administrative remedies for all claims.

### 1. Standard of Law

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). This requirement is intended to give "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id.* at 204.

Proper exhaustion is required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). "The level of detail necessary in a grievance to comply with the

grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion," *Jones*, 549 U.S. at 218.

By its plain terms, however, the PLRA requires prisoners to exhaust only those avenues of relief that are "available" to them. 42 U.S.C. § 1997a(e). When prison officials prevent a prisoner from using the correct channels to route a complaint, an administrative remedy that may be theoretically in place will not be available to the prisoner as a practical matter, and the failure to adhere to technical requirements will be excused. *Nuñez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see also* *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Confusing or contradictory information given to a prisoner is also pertinent "because it informs [the] determination of whether relief was, as a practical matter, 'available.'" *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).

A claim that a prisoner failed to exhaust administrative remedies is an affirmative defense that should be brought as an unenumerated motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2002). The district court may consider matters outside of the pleadings and can resolve disputed issues of fact, if necessary. *Id.* Defendants bear the burden of raising and proving the absence of exhaustion. *Brown*, 422 F.3d at 936-37.

### 2. Timing

Defendants first contend that the claims of the six representative plaintiffs must be dismissed because the events on which their claims are based occurred after Riggs filed

the original Complaint on January 12, 2009. According to Defendants, because these plaintiffs did not (and could not) exhaust administrative remedies before that date, § 1997e(a) prohibits them from joining this lawsuit, even if they properly exhausted their claims before they entered the case. (Dkt. 74, pp. 6-7.) Plaintiffs counter that a prisoner retains the right to seek an amendment to his complaint to add new parties and claims, in accordance with Rule 15 of the Federal Rules of Civil Procedure, as long as all claims are exhausted before they are brought into the case. The Court is persuaded that Plaintiffs' interpretation is more consistent with the text and purpose of the exhaustion requirement in the PLRA and that it avoids a conflict with the rules governing amendments of pleadings in civil cases.[2]

Defendants note correctly that when a prisoner has not exhausted administrative remedies as to *any* claim before filing suit, the complaint must be dismissed and cannot be cured by an amendment after remedies have been exhausted. *See*, *e.g.*, *McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002). Such a rule is consistent with the purpose of § 1997e(a), which is "to reduce the quantity and improve the quality of prisoner suits .... [by] afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In other words, "[p]ermitting a prisoner to sue first and then

---

[2] Defendants' argument is only about the timing of exhaustion; that is the *when* rather than the *how*. Their rule would prohibit even properly exhausted claims from being added to a case if those claims were exhausted after the complaint was filed. For purposes of this analysis, then, the Court assumes proper exhaustion.

**MEMORANDUM DECISION AND ORDER - 8**

ask the prison to address issues that are now the subject of pending litigation defeats the purpose of the PLRA's exhaustion requirement." *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005).

But that is not what occurred here. Instead, Riggs filed his Complaint after he had exhausted the prison's administrative remedies. Later, he amended the Complaint under Rule 15(a) to add Piña, Rocha, Ibarra, Kelly, and Barrios as new parties raising their own new claims for relief, and then the Complaint was amended a second time to include Enzminger as a plaintiff with his own claims.

Neither party has directed the Court to a case from the Ninth Circuit Court of Appeals that has addressed whether new parties with newly exhausted claims can enter a pending lawsuit.[3]  Defendants look to unpublished cases, primarily district court cases, to support a rule that a prisoner cannot amend or supplement his own complaint to add newly accrued claims that the prisoner has exhausted after the original filing date. (Dkt. 74, p. 6) (citing *Gann v. Neotti*, 2010 WL 2486826, *3 (S.D. Cal. 2010); *Pauline v. Patel*, 2009 WL 454653, *7 (D. Haw. 2009); *Williams v. Adams*, 2007 WL 1595457, *1 (E.D. Cal. 2007). These cases are grounded on a perceived conflict between § 1997e(a)'s exhaustion requirement and the supplementation and amendment rules for ordinary civil

---

[3] Since the original briefing was filed, Defendants have notified the Court of the Ninth Circuit's recent decision in *Rhodes v. Robinson*, Slip Op. 08-16363 (9th Cir. September 8, 2010), in which a panel of the Court of Appeals held that the PLRA's exhaustion requirement does not bar a plaintiff from submitting new claims in a second amended complaint that accrued, and were properly exhausted, after the original complaint was filed. The Court appreciates the notification.

While *Rhodes* appears to support the Court's decision in this case, it is not yet final and will not be relied on as binding authority.

MEMORANDUM DECISION AND ORDER - 9

litigation in Rule 15. A representative example is *Williams*, in which the district court concluded that, "[a]llowing plaintiff to supplement to add the claims he seeks to add would allow plaintiff to thwart the mandate of section 1997e(a), which requires that claim exhaustion occur prior to filing suit and not during the pendency of the suit." 2007 WL 1595457, *1

The Court is not persuaded by this view, and does not adopt it here. Refusing to allow an amendment or supplementation to an otherwise properly exhausted prisoner complaint simply because new claims accrued or were exhausted after the original filing date does little to further the exhaustion requirement. Assuming that administrative remedies were properly exhausted on the new claims, the prisoner would have given prison officials an opportunity to correct the problem before he haled them into court.

In fact, the intent of the PLRA to reduce the quantity and increase the quality of prisoner lawsuits could be undermined by such an inflexible rule. If prisoners cannot amend with newly exhausted claims and are instead directed to start a new action, the quantity of prison condition lawsuits would be increased, not decreased, and the quality of each of those piecemeal lawsuits would likely tack in a negative direction. Or, if the cases are consolidated, the same practical result is achieved as amendment but with the added time and expense of starting a new proceeding. Applying Defendants' position to this case would presumably have required the filing of a different complaint under a new case number that could then be consolidated, which would waste time and resources.

For the better reasoned view that § 1997e(a) does not freeze the date of the original

complaint, and that there is no conflict between the PLRA and Rule 15 when an amendment is allowed to add exhausted claims, the Court finds persuasive support in the Seventh Circuit's decision in *Cannon v. Washington*, 418 F.3d 714 (2005). In *Cannon*, a state prisoner filed a complaint under § 1983 alleging that he had been subjected to excessive force while at the Centralia Correctional Center. *Id*. at 716. When he filed his complaint, he was also pursuing administrative remedies for a second incident of excessive force that had occurred at different facility, the Menard Correctional Center. *Id*. at 717. After he completed the review process related to the Menard incident, he filed an amended complaint containing new claims. The district court concluded, in relevant part, that the prisoner could not amend to add the "Menard claims" because those claims had not been exhausted at the time that the original complaint was filed. *Id*.

On appeal, the Seventh Circuit reversed that decision. *Cannon*, 418 F.3d at 719. The Court concluded that the purposes of the PLRA were not undermined by allowing the prisoner to amend his complaint to include the properly exhausted claims because the prison's administrative process had first been allowed to run its course. *Id*. The Court noted, "that [Cannon] raised these claims by amending his complaint in an already pending case rather than initiating an entirely new proceeding is irrelevant to the objectives of § 1997e(a)." *Id*.; *see also Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005) ("[t]he filing of the amended complaint was the functional equivalent of filing a new complaint.").

Likewise, Ibarra, Piña, Rocha, Kelly, and Barrios were not joined as plaintiffs and

did not bring any claims for relief against any prison official until March 2010, and Enzminger was not added as a plaintiff until June 2010. To satisfy the exhaustion requirement, these are the critical dates by which they must have completed available administrative processes. As in *Cannon*, "that [plaintiffs] raised these claims by amending [the] complaint in an already pending case rather than initiating an entirely new proceeding is irrelevant to the objectives of § 1997e(a)."

The Supreme Court's recent PLRA decision, *Jones v. Bock*, 549 U.S. 199 (2007), also sheds light on this issue. There, the Supreme Court rejected an overly technical interpretation of the phrase "no action shall be brought" similar to the one that Defendants press here. In rejecting a rule that a prisoner's entire complaint must be dismissed if any one claim was not exhausted—the "total exhaustion" rule—the Supreme Court concluded that only non-exhausted claims need to be dismissed from the complaint. *Id*. at 223-224. In reaching that conclusion, the Supreme Court noted that "no action" was a "boilerplate" phrase, and that a prisoner's complaint must reviewed claim-by-claim for exhaustion purposes. *Id*. at 224.

Applying that common sense interpretation to the issue at hand means that each claim must have been properly exhausted before a plaintiff *seeks to include it in the case*. This applies both at the time of the original filing and when new claims are proffered by amendment. Such a rule satisfies the purpose of the exhaustion requirement, and it avoids a conflict between § 1997e(a) and the rules governing the amendment of pleadings.

This does not mean, of course, that prisoners can abuse the amendment process. A

**MEMORANDUM DECISION AND ORDER - 12**

district court must still dismiss a prisoner's complaint, or any part, that is frivolous, malicious, fails to state a claim, or seeks relief from one who is immune. 28 U.S.C. § 1915A. And the ordinary rules governing requests to supplement or amend will apply; a district court retains the discretion to deny requests that are not permitted as a matter of right based on a showing of bad faith, prejudice to the opposing side, undue delay, or futility. *Bowles v. Reade*, 198 F.3d 752, 757-58 (9th Cir. 1999).

For these reasons, the Court concludes that Plaintiffs in the present case must have exhausted their administrative remedies by the date on which they joined the case and brought claims for relief against Defendants. With the timing issue resolved, the Court now moves to a description of ICC's administrative review process, and it will then turn to a discussion of the six plaintiffs' attempts at using that process.

### 3. ICC's Administrative Review Process

#### A. *Grievances*

Ordinarily, a prisoner at ICC must attempt to resolve any "problem or action" related to his incarceration using the prison's internal grievance system. (Dkt. 74-1, Ex. 1, Att. D, p. 3.) ICC follows the same three-step administrative procedure that the Idaho Department of Correction uses, which requires a prisoner to submit an informal concern form describing the problem, followed by the filing of a formal grievance, and appealing any adverse decision. (*Id*.)

The prisoner begins this process by routing the concern form to the staff member most capable of addressing the problem. (Dkt. 74, Aff. of Chester Penn, ¶ 10.) If the issue

is not resolved, the prisoner must then complete a grievance form, attach a copy of the concern form, and file the grievance within 30 days of the incident. (*Id*. at ¶ 11.) The "grievance coordinator" at the prison will route a properly completed grievance to the appropriate staff member, who must respond within 10 days. (*Id*. at ¶ 12.)

After the staff member responds, the coordinator forwards the grievance to the "reviewing authority," usually the deputy warden, who reviews the prisoner's complaint and the staff member's response and issues a decision. (*Id*. at ¶ 12.) If the prisoner is dissatisfied with the reviewing authority's decision, he may then appeal within 5 days to the "appellate authority," which is usually the facility head. (*Id*. at ¶ 13.) Once the appellate authority has issued its decision, the grievance is then routed back to the inmate, thus concluding the administrative review process. (*Id*. at ¶ 15.)

### B. *Disciplinary Offense Reports*

A second administrative track is set up to address issues arising from disciplinary offense reports (DORs) that charge prisoners with violations of prison rules. ICC policy expressly prohibits a prisoner from using the grievance procedure to complain about the "DOR hearing process including findings and sanctions." (Dkt. 74, Ex. 1, Att. D, p. 3.) The prisoner must instead follow the established disciplinary review process, which includes a hearing in front of a disciplinary hearing officer (DHO), an appeal to the facility head, and a higher level appeal, at the prisoner's option, to IDOC's "Virtual Prison Program." (Dkt. 74, Aff. of Melodee Armfield, ¶¶ 6-8.)

Presumably, this policy is intended to funnel all complaints about DORs into the

disciplinary hearing and subsequent appeal, and to prevent a prisoner from challenging a DOR collaterally by submitting a grievance.

### 4. Attempts to Exhaust—Ibarra, Rocha, Kelly, Piña, and Barrios

#### A. *The Transfer, the Beating in the Chow Hall, and Aborted Grievances*

In early October 2009, Ibarra, Rocha, and Kelly were housed in the North Wing at ICC. (Dkt. 79-1, Dec. of Andrew Ibarra ¶ 2; Dkt. 79-2, Declaration of Joe Rocha ¶ 2; Dkt. 79-4, Declaration of Joshua Kelly ¶ 2.) On October 9, ICC employees informed them that they would be moving to the West Wing, where members of a rival gang were housed. (*Id.*) According to Plaintiffs, ICC staff ignored their verbal warnings that the move would place them in danger. (Ibarra Dec. ¶¶ 4-5; Rocha Dec. ¶ 5,  Kelly Dec. ¶ 5.) At the evening meal in the West Wing on that same day, Ibarra, Rocha, and Kelly were attacked and beaten by ten to fifteen other inmates. (*See*, *e.g.*, Ibarra Dec., ¶ 8.) Seated nearby were Piña and Barrios, who were also beaten. (Piña Dec., ¶ 3; Barrios Dec., ¶ 3.)

All five prisoners were issued DORs for fighting and placed in administrative segregation. (Ibarra Dec. ¶ 9-10; Rocha Dec. ¶¶ 10-11; Kelly Dec. ¶¶ 10-11; Piña Dec. ¶¶ 4-5; Barrios Dec. ¶¶ 4-5.) They now claim that they wanted to challenge two aspects of this incident through the prison's administrative process: (1) a failure to protect them from harm based on the transfer of rival gang members into dangerous conditions in the West Wing, and (2) the issuance of the DORs for fighting. (Ibarra Dec. ¶ 11; Rocha Dec. ¶ 13; Kelly Dec. ¶¶ 13; Piña Dec. ¶ 7; Barrios Dec. ¶¶ 6-7.)

To that end, Ibarra, Rocha, and Kelly assert that they asked the officer on duty,

Officer Soto, for concern forms, but Soto allegedly told them they must proceed solely through the DOR process because they had received DORs. (Ibarra Dec. ¶¶ 12-13; Rocha Dec. ¶ 15; Kelly Dec. ¶¶ 14-15.) Soto has filed an affidavit in this proceeding in which he claims that he does not recall any conversations with these inmates, but that he would not have told them what they now claim he said. (Dkt. 85-1, Soto Aff. ¶¶ 7-15.) Regardless of the exact nature of the exchange, if any, between Soto and Plaintiffs, the evidence before the Court shows that Ibarra, Kelly, and Rocha took initial steps to use ICC's grievance procedure.

Ibarra submitted a grievance that was routed to the Grievance Coordinator, Chester Penn, in which he claimed that "the problem is: in SEG for being jumped in the chow hall. I did not attack anyone[.] I was the one who was attacked and was seriously beaten and was in fear for my life." (Dkt. 74-1, Exhibit F.) In that form Ibarra indicated that he tried to "solve this problem informally by: Talking to SGT Beach and C/O Harold and then to Ms. Courtright[.] *Was moved to w. tier after I informed them I was not safe in that area*." (*Id.*) (Emphasis added.) Penn returned the grievance after checking a box on a pre-printed form indicating that "you cannot grieve a DOR or the Disciplinary process but must use the disciplinary appeal process." (*Id.*)

Kelly submitted an informal concern form to his case manager, Sara Fink, asking her to be a witness at his DOR hearing. In the form, he wrote, in part:

> I went to chow hall and was jumped by other inmates. I got a DOR for mutual combat but I never fought back, which C.O. Villega-Rodriguez can confirm and the video. I want to go home. I asked if I would not go to West Wing, and

you told me it would be a refusal to program. Can you please be a witness that I stated I didn't want to go so I can stay out of trouble.

(Dkt. 79-4, Kelly Exhibit 1.)

Fink responded, "your pathway is 7, MRT, your name was up on the list that is why you were moved to the West Wing. You can appeal your DOR." (*Id.*) Fink now claims that Kelly never expressed concern to her about being assaulted if transferred to the West Wing, and she understood his complaint about the transfer to be that he wanted to take a different program. (Dkt. 85-1, Fink Aff, ¶ 7.) Nevertheless, Kelly claims that based on what he was told, it was his understanding that he must raise every issue, including a failure to protect, as part of the DOR process. (Kelly Dec. ¶ 19.)

Rocha submitted a grievance in which he claimed that he was "jumped in the chow hall, received a class A DOR." (Dkt. 74-1, Attachment G.) He requested dismissal of the DOR or alternative sanctions. (*Id.*) Grievance Coordinator Penn returned the grievance after indicating that a DOR could not be grieved. (*Id.*)

## B. *Disciplinary Hearings and Appeals*

All five plaintiffs allege that at their disciplinary hearings they verbally informed the hearing officer that they should not have been found guilty, both because they were not "fighting" and because prison officials placed the prisoners in a dangerous situation. (Ibarra Dec. ¶ 18; Rocha Dec. ¶ 17; Piña Dec. ¶ 8; Kelly ¶ 18; Barrios Dec. ¶ 7.) Defendants have submitted the affidavit of a disciplinary hearing officer that the DOR process would not be an appropriate venue for raising failure to protect claims. (Dkt. 85,

Armfield Aff. ¶ 6.) The hearing officer dismissed the DOR against Kelly, but the other four were found guilty.

Ibarra, Piña, Barrios, and Rocha then appealed to the facility head. They contend that they argued in their written disciplinary appeals that they were placed in a dangerous environment and they were not fighting. (Ibarra Dec. ¶ 21; Piña Dec. ¶ 9; Barrios Dec. ¶ 9; Rocha Dec. ¶ 18.) Although Defendants have supplied copies of their disciplinary appeal forms, Ibarra, Piña, and Barrios each refer in their forms to attached pages for their argument. (Dkt. 74-1, pp. 45, 75, 86.) Defendants have not provided those pages.

Warden Valdez reduced each of the prisoners' sanctions from a Class A to a Class C infraction. In response to Ibarra's appeal, Valdez noted that "[a]lthough you advised staff of your concerns, you were required to move because of your Pathway." (*Id*.)

The prisoners next appealed to IDOC's monitor of the Virtual Prisons Program, as permitted by policy. Ibarra submitted a new form, as requested, this time writing that he had "informed staff that they were putting me in a bad situation by moving me from J-Block to W-Pod and was moved anyways." (Dkt. 74-2, p. 77.) Piña wrote that "the ICC Administration caused the assault to happen when they moved rival gang members together. They failed to protect me and then punished me." (Dkt. 74-2, p. 49.) Barrios asserted that "[t]he administration forced rival gangs to live with each other and they knew or should have known there was going to be violence." (Dkt. 74-2, p. 86.) Rocha wrote, "I received a DOR for me being assaulted by several inmates." (Dkt. 74-2, p.62.)

By early February 2010, the Virtual Prison Program appeals were denied, and

these five prisoners joined the present lawsuit in March 2010.

### 5. Analysis – Ibarra, Rocha, Kelly, Piña, and Barrios

Defendants argue that these plaintiffs did not raise any claims in the grievance process, which Defendants claim was the proper procedure, related to the failure to protect them from harm. Plaintiffs respond that they exhausted all claims through DOR hearings and appeals before they were added to the lawsuit. Alternatively, they assert that if they were required to present these issues through grievances, that procedure was not truly available to them because prison officials told them that they must raise all claims in DOR proceedings.

The Court finds that the transfer, the fight, and the subsequent DOR proceeding were so bound up as to be nearly indistinguishable. Any meaningful distinction between a claim based on the transfer into danger—that is, a failure to protect from harm—and a challenge to a DOR based on the fight that ensued quickly and as result of those allegedly dangerous conditions is exceedingly subtle. A prisoner in this situation could reasonably perceive this to have been one continuous and interrelated chain of events. It is also not unreasonable for a prisoner to believe, correctly or incorrectly, that prison officials' alleged partial responsibility for creating the volatile environment might be a defense to the DOR, in addition to the claim that the prisoner was only defending himself.

The prison's rules do nothing to dispel this confusion. According to policy, prisoners are prohibited from using a grievance to complain about the "DOR hearing process including findings and sanctions." (Dkt. 74, Ex. 1, Att. D, p. 3.) Defendants have

not demonstrated that the dividing line between a DOR and non-DOR issue is as pristine as they now claim.

To further confuse matters, Ibarra, Kelly, and Rocha actually attempted to use the grievance process with greater or lesser degrees of specificity about the transfer and failure to protect issue, only to be rebuffed. It may have been reasonable for Grievance Coordinator Penn and Case Manger Fink to interpret these prisoners' complaints primarily as raising factual challenges to the DOR charge. But it was equally reasonable for the prisoners—at least Ibarra and Kelly—to take from the responses that all related issues, including the transfer into harm's way, must also go through disciplinary review hearings and appeals. It appears that the prisoners and the responding officials each placed a different meaning on what the prisoners were complaining about, and that there was no attempt to disentangle grievable from non-grievable matters.

The Court therefore concludes that a lack of clarity in the rules regarding how to present a claim that could be characterized as a complaint about prison conditions but that is also closely related to disciplinary offense proceedings, coupled with confusing or misleading advice from prison authorities, reasonably led these prisoners to believe that the DOR process was the appropriate vehicle for raising all such claims. If the grievance procedure instead offered the only administrative remedy, it was not available to these plaintiffs as a practical matter. *Nuñez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010).

Nevertheless, Plaintiffs must still have made a diligent and good faith effort to alert officials through DOR proceedings of the nature of the problem for which they now

seek relief. *See Nuñez* 591 F.3d at 1224 (holding that, when a prisoner has been misled about proper procedures, he must still take "reasonable and appropriate steps" to exhaust his claims). All five plaintiffs claim that they informed the disciplinary hearing officer that the movement of rival gang members created a dangerous situation. Defendants have submitted an affidavit from a disciplinary hearing officer who contends that the scope of a DOR hearing is limited to whether the defendant committed the infraction charged, but this does not answer whether these plaintiffs framed the issues in the manner that they claim they did. Defendants have the burden to show otherwise.

Kelly received relief at his hearing, and there was no indication that he could receive additional relief at a higher level, thus obviating him of the need to proceed further for exhaustion. *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). Ibarra, Piña, and Barrios claim that they next raised the failure to protect issue in their disciplinary appeals. Though the Court does not have access to the additional pages from their appeals to the facility head to verify that claim, it is clear that prisoners mentioned the transfer into an allegedly dangerous environment with specificity in their appeals to the Virtual Prison Program monitor. (Dkt. 74-2, pp. 49, 76, 86.). As a result, these plaintiffs made a diligent effort to notify officials of their failure to protect claims.

Only Rocha fails this test. In his appeal to the facility head, he wrote, "I went from J to W to do my program. I didn't want any trouble. I want to go home. I was at West Wing for 2 hours went to dinner. I was eating my meal when those guys jumped the rail and attack me. All I ask is to be dropped to a B or C or Dismiss." (Dkt. 74-2, p. 55.) In his

appeal to the Virtual Prison Program monitor, he wrote "I received a DOR for me being assaulted by several inmates." (Dkt. 74-2, p.62.) Rocha did not make a good faith effort to alert prison officials to the facts comprising any current claim, and he cannot go forward as a named plaintiff in this lawsuit.

### 6. Enzminger

The sixth plaintiff covered by Defendants' Motion, Randy Enzminger, was added to this case in the Second Amended Complaint, filed in June 2010.

Enzminger claims that while he lived on K-pod in March 2009, another group of inmates ordered him to pay "rent." (Dkt., p. 71. ¶ 148.) He alleges that he feared for his safety and requested to be moved, but that staff refused to do so. (*Id*. at ¶ 149.) He was assaulted in mid-March 2009 for failing to pay the requested "rent," and he suffered a broken nose, lacerations, possible rib fractures, and broken teeth. (*Id*. at ¶ 150.) He was treated at the infirmary but x-rays were not taken, despite his request. (*Id*. at ¶ 154.) He was assaulted again for similar reasons in late March 2009, and he claims again that no x-rays were taken of his injuries. (*Id*. at 159.) A third assault occurred in March 2010; this time he received severe cuts and two chipped teeth. (*Id*. at ¶ 169.)

After the third assault, Enzminger submitted a concern form to a staff member, writing, in part, "what's the reason you have failed your duty to properly investigate this felonious assault and battery as required? Have you filed a complaint with the Ada Co. Sheriff? If not, do so. Please investigate and report to have them charged criminally." (Dkt. 74-1, p. 63.)

**MEMORANDUM DECISION AND ORDER - 22**

Not satisfied with the response, he filed a formal grievance, writing that he believed that the ICC staff member had not completed a proper investigation and had failed in his duty to contact law enforcement authorities. (Dkt. 74-1, p. 67.) Enzminger asked officials to pursue a criminal complaint, and he sought "$10 million for damages for failure to protect." (*Id*.) The facility head denied the grievance after informing him that Ada County was contacted but refused to pursue criminal charges. (*Id*.) The request for damages for "failure to protect" was denied. (*Id*.) The grievance was completed by May 4, 2010.

Enzminger's subsequent grievance for "CCA's non-actions in failing to protect me from assault," requesting that a doctor "fix [his] nose," was returned unprocessed because he did not file a concern form within 30 days of the event. (Dkt. 74-2, p. 71.)

Defendants' current interpretation of Enzminger's first grievance as requesting only that prison officials report the assault to Ada County law enforcement is an overly cramped reading of that complaint. Undoubtedly, this was a concern of his, but the grievance also shows that he was motivated in no small part by the prison's failure to investigate the assault and to protect him from harm. Indeed, he specifically mentions the lack investigation into the matter and he asks for $10 million for "failure to protect." (Dkt. 74-1, p. 67.) The Court concludes that Enzminger's grievance sufficiently and timely exhausted those matters.

On the other hand, despite the allegations in the Second Amended Complaint that x-rays were not taken after the assaults, Enzminger did not properly exhaust a claim

based on the failure to provide adequate medical care. His only grievance related to that issue was dismissed as untimely.

### 7. The Scope of Exhaustion

The question remains as to the proper scope of the failure to protect claim. In the Second Amended Complaint, the proposed class plaintiffs allege that, as a result of Defendants' policies and practices, they are "being denied reasonable protection from assault," in violation of their rights under the Eighth and Fourteenth Amendments. (Dkt. 71, ¶ 488.) Plaintiffs then list the "policies and practices" that have resulted in the constitutional violation, including "the failure to hire an adequate number of staff; the failure to adequately train staff; the failure to adequately investigate each prisoner assault to determine whether it could have been prevented by staff and whether misconduct or malfeasance caused or contributed to the assault; to issue adequate written findings, conclusions, and recommendations after each assault; the failure to eliminate the code of silence that pervades ICC; the failure to ensure that non-compliant or untrained staff receive the discipline they deserve or additional training they need to prevent unnecessary violence at ICC; the failure to adequately punish the violent offenders who assault prisoners; the failure to provide adequate medical care to the victims of assault; the failure to provide sufficient living space to each prison; and the policy and practice of issuing DORs to the victims of assault." (*Id.*)

Defendants split each of these listed policies and practices into a "claim" for relief that they argue must have been separately exhausted. For the most part, the Court

disagrees.

"[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion," including defining the factual specificity that is needed to complete a proper grievance or administrative complaint. *Jones v. Bock*, 549 U.S. 199, 218 (2007). The Court has already determined that the failure of the plaintiffs from the chow hall beating to complete the grievance procedure at ICC has been excused, and whatever level of specificity that the prison demands in a grievance is not applicable to them. Defendants' reliance on those rules as to the chow hall plaintiffs is inapposite.

When the prison's rules do not dictate the requisite level of detail for proper review, a prisoner's complaint "suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (adopting the standard in *Strong v. David,* 297 F.3d 646, 650 (7th Cir. 2002). This is so because the primary purpose of a prison's administrative review system is to "notify the prison of a problem and to facilitate its resolution." *Griffin v. Arpaio*, 557 F.3d at 1120; *see also Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004) (noting that legal theories need not be presented in grievances).

The chow hall plaintiffs (minus Rocha) alerted prison officials to a failure to protect them from harm based on the mixing of rival gang members. Enzminger accused prison officials of not protecting him from a beating and then failing to follow-up with an adequate investigation. These were the core "problems," as the prisoners understood them, and they were direct outgrowths of the Defendants' alleged deliberate indifference

to their safety. The prisoners cannot reasonably have been expected to argue legal theories, nor can they be expected to know of more systemic failures at ICC that allegedly contributed to the incidents; instead, they reasonably perceived a small slice of what is now alleged to be symptomatic of a much wider problem. *See*, *e.g.*, *Strong*, 297 F.3d at 650 ("[a]s in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief."). Issues such as inadequate staffing, a failure to train, a failure to discipline correctional officers and other prisoners, the lack of sufficient written findings when assaults occurred, and a pervasive "code of silence," are not matters that an individual prisoner who has been beaten in one or two separate incidents can be expected to know without a full investigation that is beyond his capacity and authority to conduct. If these issues exist, a thorough investigation by prison officials into the failure to protect issues that were brought to their attention would presumably uncover them.

However, the claim that Defendants did not provide adequate post-assault medical care is too far afield. It would not be an onerous burden on a prisoner to complain formally about the lack of medical treatment after an assault, even if the prisoner does not know that the reason for that lack of treatment is a supposed desire to cover-up violence. Accordingly, the Third Claim for Relief in the Second Amended Complaint, to the extent that it is brought by these six plaintiffs and the potential class they represent, will be

dismissed.[4]

## CONCLUSION

Plaintiffs Ibarra and Barrios may remain as representative plaintiffs at this time. Plaintiff Rocha and his claims are dismissed from this lawsuit based on a failure to exhaust administrative remedies. The portion of the Third Claim for Relief in the Second Amended Complaint that applies to Ibarra, Piña, Kelly, Barrios, or Enzminger and the putative class of similarly situated prisoners, is also dismissed. No other named plaintiff or claim shall be dismissed at this time, and Riggs's Eighth Amendment failure to protect and medical care claims are not disturbed by this ruling.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Second Amended Complaint (Docket No. 73) is GRANTED in part and DENIED in part, as set forth above.

IT IS FURTHER ORDERED that Plaintiffs shall renew their motion for class certification, if any, on or before November 5, 2010. No later than 21 days after the motion is filed, the parties shall have conferred on a discovery plan for certification issues and shall submit a joint proposed scheduling order governing those and any other pertinent matters to the Court.

---

[4] The Court expresses no opinion on whether another prisoner with a properly exhausted Eighth Amendment medical claim based on similar facts could seek to consolidate his complaint or claim with this case and seek to represent a class of similarly situated prisoners.

DATED:  **October 18, 2010**



Honorable B. Lynn Winmill
Chief U. S. District Judge